1  E. JOSEPH CONNAUGHTON (SBN 166765)
   jconnaughton@paulplevin.com
2  AARON A. BUCKLEY (SBN 202081)
   abuckley@paulplevin.com
3  DOUGLAS R. CLIFFORD (SBN 231971)
   dclifford@paulplevin.com
4  **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP
   401 B Street, Tenth Floor
5  San Diego, California  92101-4232
   Telephone: 619-237-5200
6  Facsimile: 619-615-0700

7  Attorneys for Defendant KELLY SERVICES, INC.

8

9                  UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11 CATHERINE SULLIVAN, on behalf of       CASE NO. CV 08-03893 CW
   herself and all others similarly situated,   Related to Case No. CV 07-02784 CW
12
                 Plaintiff,               **CLASS ACTION**
13
         v.                               **DEFENDANT KELLY SERVICES, INC.'S**
14                                        **OPPOSITION TO PLAINTIFF'S MOTION**
   KELLY SERVICES, INC.; and DOES 1       **FOR CLASS CERTIFICATION**
15 through 10, inclusive,
16               Defendants.
                                          Hearing Date:    No hearing required
17                                        Courtroom:       2
                                          Judge:           Hon. Claudia Wilken
18                                        Trial Date:      Not set

19

20

21

22

23

24

25

26

27

28

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

CV 08-03893 CW

**TABLE OF CONTENTS**

PAGE

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.  STATEMENT OF FACTS ................................................................................................ 2

    A.   Some Employees Attended Interviews; Others Did Not. ..................................... 2

    B.   Some Individuals Who Attended Interviews Were Not "Employees," and Therefore Would Be Excluded From the Proposed Class. ................................................................................................. 2

    C.   Some Temporary Employees Were Employed by Other Staffing Companies (Kelly's Competitors) at the Same Time They Were Employed by Kelly. ............................................................................................ 3

    D.   Which Employees Attended Interviews, and Which Did Not, is Unknown. ............................................................................................................ 3

    E.   The Extent of Kelly's "Control" Over Placement Interviews Varies Considerably, Subject to Numerous Individual Factors. ..................................... 4

        1.   Kelly's Temporary Employees are not Required to Interview with Customers. ............................................................................................ 4

        2.   The Customer, and Not Kelly, Decides Which Applicants/Employees to Interview. ......................................................... 5

        3.   Kelly's Recruiters and Managers Typically Do Not Attend Interviews or Otherwise Control Anything That Happens During Interviews. .......................................................................................... 5

        4.   The Purpose of Placement Interviews is to Allow the Employees to Market Themselves, Not For Surreptitious Kelly Marketing. ...................................................................................... 6

        5.   Practices at Different Kelly Branch Offices Vary Considerably Depending on the Clients' Wishes, Managers' Preferences, and a Variety of Other Situation-Specific Factors. ................................................................................................... 7

        6.   The Duration of Interviews Varies Widely; Some Last Only a Few Minutes. ................................................................................... 8

        7.   There is Little or No Evidence of Employee Discipline Arising From Interview Conduct. .......................................................... 9

        8.   Some Customers Conduct Interviews of Kelly Employees/Applicants on Their Own, With No Involvement by Kelly, And Notify Kelly Only After the Interview Has Occurred. ........................................................................................... 9

9.  Some Interviews are for Temp-To-Hire Situations in Which the Employee/Applicant is Actually Interviewing for a Permanent Position With the Customer...................................................... 10

III.  CLASS CERTIFICATION SHOULD BE DENIED BECAUSE PLAINTIFF HAS FAILED TO SATISFY HER BURDEN OF PROOF UNDER RULE 23 ............................................................................................ 10

A.  Discussion of Applicable Law. ................................................................ 10

    1.  Required Elements of Rule 23. ............................................................ 10

    2.  Plaintiff Bears the Burden of Proving Each Element by a Preponderance of the Evidence......................................................... 11

B.  Plaintiff Has Failed to Present Facts to Satisfy the Numerosity, Commonality, and Typicality Requirements of Rule 23(a). ...................... 12

    1.  Plaintiff has Failed to Establish Facts to Show Numerosity................... 12

    2.  Plaintiff has Failed to Establish Facts to Show Commonality. ................................................................................ 13

    3.  Plaintiff has Failed to Establish Facts to Show Typicality. ................... 14

C.  Plaintiff Has Failed to Satisfy the Predominance and Superiority Requirements of Rule 23(b)(3). ............................................................... 15

    1.  Plaintiff Has Failed to Present a Tenable Trial Plan............................. 15

    2.  The Class is Not Readily and Reliably Ascertainable. ........................... 16

    3.  Plaintiff's Proposed Questionnaire is Unreliable for Ascertaining the Class or to Resolve Other Issues. ............................. 17

        a.  Ambiguity, Confusion, and Recall Error. ...................................... 18

        b.  Self-Interest Bias......................................................................... 18

        c.  Non-Response Bias........................................................................ 19

        d.  Lack of Representativeness/Sampling Error................................... 19

    4.  Even if the Class Could be Ascertained, Individual Issues as to Liability Would Predominate......................................................... 20

    5.  The Existence of a Common Policy Does Not Establish Predominance for Purposes of Rule 23(b)(3). ..................................... 23

    6.  Plaintiff Fails to Present Any Plan for Adjudicating Damages.................................................................................. 24

IV.  CONCLUSION ...................................................................................................... 25

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

ii

CV 08-03893 CW

1

**TABLE OF AUTHORITIES**

PAGE

2

3

**FEDERAL CASES**

*Aiello v. Providian Fin. Corp.*
    239 F.3d 876 (7th Cir. 2001) ...................................................................24

*Amchem Prods, Inc. v. Windsor*
    521 U.S. 591 (1997).................................................................................15

*American National Fire Insurance Co. v. York County*
    No. 08-2439, 2009 WL 2385464 (1st Cir. 2009)....................................15

*Brown v. FedEx Corp.*
    249 F.R.D. 580 (C.D. Cal. 2008)............................................................16

*Celano v. Marriott Intl., Inc.*
    242 F.R.D. 544 (N.D. Cal. 2007)............................................................13

*Coleiro v. Spartan Stores, Inc.*
    No. 02-150, 2004 WL 3951586 (W.D. Mich. Aug. 16, 2004) ................16

*Doninger v. Pacific Northwest Bell, Inc.*
    564 F.2d 1304 (9th Cir. 1977) .................................................................11

*Dunnigan v. Metropolitan Life Ins. Co.*
    214 F.R.D. 125 (S.D.N.Y. 2003).............................................................16

*EEOC v. MCI Int'l, Inc.*
    829 F.Supp 1438 (D.N.J. 1993)...............................................................15

*Gen. Tel. Co. v. Falcon*
    457 U.S. 147 (1982)...................................................................11, 12, 14

*Hanlon v. Chrysler Corp.*
    150 F.3d 1011 (9th Cir. 1998) ...........................................................11, 23

*Hanon v. Dataprods. Corp.*
    976 F.2d 497 (9th Cir. 1992) ...................................................................14

*Harper, et al. v. Ulta Salon Cosmetics & France, Inc.*
    2005 WL 3542482 (N.D. Ga. Dec. 23, 2005).........................................13

*In re Hotel Tel. Charges*
    500 F.2d 86 (9th Cir. 1974) .....................................................................25

*In re Hydrogen Peroxide Antitrust Litigation*
    552 F.3d 305 (3rd Cir. 2008) ...................................................................12

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

iii

CV 08-03893 CW

*In Re IPO Securities Litig.*
  471 F.3d 24 (2d Cir. 2006) .................................................................................................16

*In re LDK Solar Sec. Litig.*
  255 F.R.D. 519 (N.D. Cal. 2009)........................................................................................12

*In re Wal-Mart Wage and Hour Empl. Prac. Litigation*
  2008 WL 3179315 (D. Nev. June 20, 2008)........................................................................16

*In re Wells Fargo Home Mortgage Overtime Pay Litig.*
  571 F.3d 953 (9th Cir. 2009) ...................................................................................11, 23, 24

*In re Wells Fargo Home Mortgage Overtime Pay Litig.*
  No. C 06-01770 MHP, 2010 WL 174329 (N.D. Cal. Jan. 13, 2010) .........................11, 23, 24

*Johnson, et al. v. Big Lot Stores, Inc.*
  561 F.Supp.2d 567 (E.D. La. 2008) .....................................................................................22

*LeGrand v. NYC Transit Authority*
  1999 WL 342286 (E.D.N.Y. May 26, 1999) ........................................................................13

*Lindow v. United States*
  738 F.2d 1057 (9th Cir. 1984) .............................................................................................22

*Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*
  244 F.3d 1152 (9th Cir. 2001) .............................................................................................11

*McBean v. City of New York*
  260 F.R.D. 120 (S.D.N.Y. 2009) .........................................................................................16

*McLaughlin v. Am. Tobacco Co.*
  522 F.3d 215 (2d Cir. 2008) ................................................................................................25

*Mike v. Safeco Ins. of America*
  223 F.R.D. 50 (D. Conn. 2004) ...........................................................................................16

*Poulos v. Caesars World, Inc.*
  379 F.3d 654 (9th Cir. 2004).............................................................................................25

*Quinn v. Nationwide Ins. Co.*
  281 Fed. Appx. 771 (10th Cir. 2008).................................................................................12

*Rink v. Cheminova*
  203 F.R.D. 648 (M.D. Fla. 2001) ........................................................................................16

*Roe v. Highland*
  909 F.2d 1097 (7th Cir. 1990) .............................................................................................13

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

iv

CV 08-03893 CW

*Sepulveda v. Wal-Mart Stores, Inc.*
  237 F.R.D. 229 (C.D. Cal. 2006)........................................................................22

*Vinole v. Countrywide Home Loans, Inc.*
  571 F.3d 935 (9th Cir. 2009) ......................................................................23, 24

*Zinzer v. Accufix Research Institute, Inc.*
  253 F.3d 1180, *amended* 273 F.3d 1266 (9th Cir. 2001).......................................11

**FEDERAL STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

Fed.R.Civ.P. 23.............................................................................................passim

Fed.R.Civ.P. 23(a) .......................................................................................11, 12

Fed.R.Civ.P. 23(a)(1)....................................................................................12, 13

Fed.R.Civ.P. 23(a)(2)....................................................................................13, 14

Fed.R.Civ.P. 23(a)(3)....................................................................................14, 15

Fed.R.Civ.P. 23(b)..............................................................................................11

Fed.R.Civ.P. 23(b)(3).............................................................................11, 15, 23

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

v

CV 08-03893 CW

# I. INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff's motion for class certification fails to meet her burden to prove that the proposed class involves common questions of law or fact and that these issues predominate, as is required by Rule 23. Indeed, plaintiff has not even presented a reliable plan for identifying the proposed class members, let alone for adjudicating their diverse underlying claims on a class-wide basis. Plaintiff's motion should be denied.

Plaintiff essentially asks this Court to allow her to: (1) attempt to ascertain the class members via a vaguely-described questionnaire sent to all of Kelly's current and former employees; and (2) try the case on a class-wide basis based on the existence of a phantom "uniform" policy governing placement interviews. Yet plaintiff surprisingly presents no statistical evidence to show that such a survey could accurately, reliably and fairly identify the class members, and it is well-settled that even if a "uniform" policy were to exist (which it doesn't here), that fact is not sufficient to support class certification as a matter of law.

Yet the most glaring deficiency in plaintiff's motion is her failure to present a cogent trial plan, especially because plaintiff admits that the proposed class is not currently ascertainable. She proposes to cure this deficiency by means of a questionnaire/survey to be mailed to all of Kelly's current and former temporary employees, without bothering to present any statistical evidence (or, for that matter, any evidence at all) to establish the reliability of such a process. As is discussed in more detail below, it is well established that surveys such as the one proposed by plaintiff are plagued by a variety of serious, incurable flaws and thus cannot be relied upon.

Moreover, even if the proposed class could be reliably ascertained (which it can't), plaintiff fails to offer any convincing evidence to show that the extent of Kelly's control over the customer placement interviews – which this Court has already determined is the key test to determine whether the time employees spent in those interviews is compensable – is subject to common proof. Instead, plaintiff conclusorily argues that "uniform policies and procedures" applied to the proposed class members and ends her analysis there. And even a cursory inquiry reveals that plaintiff's cited evidence often doesn't support her arguments. In fact, as is shown below and in the declarations accompanying this memorandum, the weight of the evidence

1  demonstrates that individual issues predominate over – indeed, overwhelm – common issues, and

2  that any attempt to try this case on a class-wide basis would prove unworkable and result in

3  extensive mini-trials.

4      At bottom, plaintiff has failed to satisfy her required burden to present a workable trial

5  plan, has failed to show that the proposed class is ascertainable, has failed to establish that

6  common issues predominate, has failed to establish commonality, numerosity, or typicality, and

7  has failed to show that the class action mechanism is the superior method of resolving the

8  proposed class members' claims.  And, moreover, the evidence shows that even if the class

9  members could be reliably identified, individual issues would predominate.  Plaintiff therefore

10  has failed to satisfy all of the elements of Rule 23 necessary to support class certification and,

11  accordingly, her motion should be denied.

12  ## II.  STATEMENT OF FACTS

13      The facts do not lend themselves to a common, uniform, class-wide adjudication.

14  **A.**    **Some Employees Attended Interviews; Others Did Not.**

15      Plaintiff's proposed class would include "All individuals who were or are employed by

16  Kelly Services, Inc. as a temporary employee within the State of California at any time between

17  August 14, 2004 and the date the trial commences in this action, and who attended at least one

18  interview with a Kelly customer."  Plaintiff's Motion for Class Certification; Memorandum of

19  Points and Authorities in Support Thereof (hereinafter "Motion"), 14:1-2.

20      It is undisputed that not all Kelly's temporary employees attend interviews; even

21  according to plaintiff, an estimated 50% of Kelly's customers do not require interviews with Kelly

22  temporary employees prior to accepting them for assignment.  Motion, 6:10-11.  As is explained

23  in Sections III.C.2-3 below, plaintiff has not provided a workable means to distinguish between

24  employees who did, and did not, attend placement interviews.

25  **B.**    **Some Individuals Who Attended Interviews Were Not "Employees," and Therefore**

26         **Would Be Excluded From the Proposed Class.**

27      Plaintiff defines a "temporary employee" to include only those persons "who worked at

28  least one day on an assignment with a Kelly customer within Kelly's commercial or non-

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

2

CV 08-03893 CW

1   commercial divisions." Motion, 1 at fn. 3. By this definition, any individual who attended an

2   interview without having been previously assigned would be excluded from the proposed class

3   because that individual was not yet an employee.

4        Plaintiff has not addressed this issue, or provided a reliable means of distinguishing

5   between employees who attended interviews while they were *employees*, or those who attended

6   interviews while *applicants*, and became employees at some later time.

7   **C.    Some Temporary Employees Were Employed by Other Staffing Companies (Kelly's**

8           **Competitors) at the Same Time They Were Employed by Kelly.**

9        Due to the unique, intermittent nature of temporary employment, it is not uncommon for a

10  Kelly temporary employee to be simultaneously registered with and/or "employed" by other

11  staffing companies (Kelly's competitors). Aikin decl., Ex. RRR at 1065-68, ¶ 13[1]; Leatherman

12  decl., Ex. JJJ at 1029-33, ¶ 7; Jimenez decl., Ex. DDD at 1003-06, ¶ 8; Mann decl., Ex. VV at

13  966-70, ¶ 12; Buschini decl., Ex. XX at 976-80, ¶ 10; LeClair decl., Ex. YY at 981-84,  ¶ 8.

14  Plaintiff herself accepted an assignment from a Kelly competitor, HR Solutions, while remaining

15  a Kelly employee. Stipulation of Facts, Ex. RR (*see also,* Docket No. 28) at 889-902, ¶ 17. Prior

16  to that, and while still a Kelly employee, plaintiff accepted temporary employment with a law firm

17  without any participation by Kelly. *Id.,* ¶ 25.

18  **D.    Which Employees Attended Interviews, and Which Did Not, is Unknown.**

19       Although plaintiff has proposed a class definition that includes only those temporary

20  employees who attended at least one placement interview with a Kelly customer after having been

21  previously assigned, it is undisputed that precisely *which* of Kelly's current and former temporary

22  employees attended such an interview, or when, or with whom, or for how long, is unknown.

23  Motion, 7:10-11, 14:24-25.

24

25

26  [1] In support of her motion, plaintiff submitted Exhibits A-SS (paginated 1-919) attached to the
    Declaration of Eric Grover. For the Court's convenience, Kelly has adopted the same system for
27  the designation of its own exhibits, which are attached to the Declaration of Aaron Buckley as
    Exhibits TT-WWW (paginated 920-1100).
28

DEFENDANT'S OPPOSITION TO PLAINTIFF'S                 3                    CV 08-03893 CW
MOTION FOR CLASS CERTIFICATION

E.    **The Extent of Kelly's "Control" Over Placement Interviews Varies Considerably,
Subject to Numerous Individual Factors.**

Although plaintiff asserts that temporary employees' placement interviews with Kelly customers are subject to "uniform" policies and practices, the developed evidence is contrary and shows that numerous individual issues affect these interviews.

1.    **Kelly's Temporary Employees are not Required to Interview with Customers.**

Plaintiff implies that participation in placement interviews is somehow required or necessary for *Kelly* employment or for placement with particular customers.  Motion, 6:14-16, 7:18-20.  Plaintiff's assertions seem misleading, as the undisputed evidence shows that placement practices vary from customer to customer, some of which do not require interviews at all, and some of which require interviews for some assignments but not others.

As plaintiff concedes, only around 50% of Kelly's customers interview Kelly employees/applicants prior to offering assignments.  Motion, 6:10-11; *see also* Aikin decl., Ex. RRR at 1065-68, ¶ 7 (some customers do not interview employees before accepting them for assignment).  Some Kelly customers interview for some assignments, but not others.  Wells decl., Ex. HHH at 1018-22, ¶ 4.  In general, customers of Kelly's commercial division require fewer interviews than those of Kelly's professional/technical division.  Wilhite decl., Ex. NNN at 1049-52, ¶ 6.  Clerical assignments require interviews more often than light industrial assignments.  Nations decl., Ex. BBB at 995-98, ¶ 4; Ramirez decl., Ex. UU at 961-65, ¶ 20.  Whether a customer interviews for an assignment "depends on the department, on the assignment, the skill set of the Kelly employee and it depends on the particular hiring manager."  Wells decl., Ex. HHH at 1018-22, ¶ 4.  "[S]ome clients always do interviews, some never do interviews and, for others, it depends on the position, the duration of the assignment, and whether it is a temp-to-hire position."  Harris decl., Ex. CCC at 999-1002, ¶ 5.

It is undisputed that Kelly employees are not only allowed to accept or decline any offered work assignments, but also may accept or decline the opportunity to attend placement interviews.  Stipulation of Facts, Ex. RR at 889-902, ¶ 16; Wells decl., Ex. HHH at 1018-22, ¶ 16; Bhalla decl., Ex. SSS at 1069-72, ¶ 12; Dun decl., Ex. OOO at 1053-55, ¶ 10; Wilhite decl., Ex. NNN at

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

4

CV 08-03893 CW

1  1049-52, ¶ 9; Facundo decl., Ex. QQQ at 1060-64, ¶ 17 (employees "frequently decline"

2  invitations to interview).

3      Plaintiff has presented no evidence (because none exists) that would show that *any* Kelly

4  temporary employee was *ever* required to attend a placement interview with a customer, or was

5  disciplined for declining to attend an interview, or was ever adversely impacted in any way for

6  declining an interview.  And although participation in an interview might be a prerequisite to

7  being considered for a *particular* position, there is no general requirement to participate in a

8  placement interview to become or remain an employee of Kelly, or even to obtain an assignment

9  with a particular customer (because even customers who request interviews for some positions

10 don't necessarily require them for all positions).  Wells decl., Ex. HHH at 1018-22, ¶ 4.

11     **2.     The Customer, and Not Kelly, Decides Which Applicants/Employees to**

12         **Interview.**

13     Although plaintiff implies that Kelly decides which temporary employees to send on

14 interviews (Motion, 8:18-23), it is actually the customer, and not Kelly, that decides which of

15 Kelly's temporary employees to interview.  Wells decl., Ex. HHH at 1018-22, ¶ 5; Saltsman decl.,

16 Ex. GGG at 1013-17, ¶ 6; Santos decl., Ex. KKK at 1034-38, ¶ 5.  Upon request from a customer,

17 Kelly assembles resumes of candidates that might be suitable for the position and provides them

18 to the customer.  Baker depo., Ex. UUU at 1079, ln. 1-9.  However, the *customer* decides which

19 employees, if any, it wishes to interview for the position.  Merri depo., Ex. VVV at 1084, ln. 7-11.

20     **3.     Kelly's Recruiters and Managers Typically Do Not Attend Interviews or**

21         **Otherwise Control Anything That Happens During Interviews.**

22     The activities that plaintiff describes in support of her "control" argument primarily

23 involve pre- and post-interview communication between Kelly recruiters and Kelly temporary

24 employees (such as providing pre-interview advice or obtaining feedback), *not* activities or

25 interactions occurring during the actual interviews themselves – the crucial issue for liability

26 analysis.  This is unsurprising, because placement interviews are rarely attended by anyone other

27 than the customer representatives and the Kelly temporary employees (or applicants) seeking the

28 assignment.  *See* Wells decl., Ex. HHH at 1018-22, ¶ 6 (staffing manager never attended a single

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

5

CV 08-03893 CW

1    customer interview of a Kelly temporary employee); Aikin decl., Ex. RRR at 1065-68, ¶ 9 (same);

2    Facundo decl., Ex. QQQ at 1060-64, ¶ 19 (same).

3         Consequently, Kelly's staffing and recruiting managers have little – or, more accurately

4    stated, no – control over what happens during the interview. *See* Wells decl., Ex. HHH at 1018-

5    22, ¶ 12 (staffing manager facilitates scheduling the interview, but has "no control" over the

6    actual interview or how it is conducted); Wilhite decl., Ex. NNN at 1049-52, ¶ 4 ("the interview

7    process is 'client-driven'"); Burns decl., Ex. LLL at 1039-43, ¶ 8 ("The interview process for an

8    employee looking for a potential assignment depends on the client, the employee, and the

9    position.")

10        **4.      The Purpose of Placement Interviews is to Allow the Employees to Market**

11             **Themselves, Not For Surreptitious Kelly Marketing.**

12        Although plaintiff argues that customer interviews of Kelly's temporary employees are a

13   key marketing tool for Kelly to promote its overall staffing services, the evidence that plaintiff

14   cites for this representation doesn't really support it. *See, e.g.,* Ex. D, 75-77 (testimony that

15   Kelly's employees are "kind of like" its product); Ex. JJ, 705-07 (testimony suggesting that Kelly

16   screens individuals based, in part, on their interview skills); Ex. MM, 813-14 (testimony

17   acknowledging that it is important for Kelly employees to perform well in interviews). In sum,

18   plaintiff has not shown any evidence that Kelly views placement interviews of its employees as a

19   "key marketing tool" for Kelly to promote its overall staffing services.

20        On the contrary, the evidence shows that placement interviews are primarily viewed as

21   opportunities for the employees to market *themselves*, not Kelly, to customers. As one current

22   Kelly recruiter, who was formerly a business development manager, explains: "A Kelly employee

23   is not marketing for Kelly during their interview. They are marketing themselves. They do not

24   talk about Kelly – they are talking about themselves. They are not selling Kelly – they are selling

25   themselves. They are talking about their own skill set. Kelly has business development people

26   that talk about Kelly to the clients – it is not temporary employees." Noguera decl., Ex. PPP at

27   1056-59, ¶ 10. "The employee is at the interview for themselves; Kelly is just the venue that

28   helps them get a job." Stokes decl., Ex. EEE at 1007-09, ¶ 7.

1   This is reinforced by the fact that many, if not most, customers who interview Kelly

2   employees are already Kelly customers and therefore are already familiar with Kelly's services.

3   For example, a longtime customer of Kelly confirms that when he interviews Kelly employees, he

4   is interested in the employee's skills, not Kelly: "Kelly brought me the person to interview, but

5   the person needs to market themselves to get the position. During an interview, Kelly temporary

6   employees are selling themselves in the interview – not Kelly." Virgil decl., Ex. TTT at 1073-76,

7   ¶ 6. "Kelly's role is similar to a headhunter." *Id.,* ¶ 11.

8       **5.    Practices at Different Kelly Branch Offices Vary Considerably Depending on**

9           **the Clients' Wishes, Managers' Preferences, and a Variety of Other Situation-**

10          **Specific Factors.**

11  Although plaintiff has pointed to allegedly "uniform" policies developed by Kelly, the

12  evidence shows that the policies do not result in uniform practices in the field. Rather, managers

13  and recruiters in Kelly's branch offices follow different practices based on their particular clients'

14  needs, and in the exercise of their own managerial style and discretion. Merri depo., Ex. VVV at

15  1086-87, ln. 21-6 (each branch and recruiter use the SOP manual (Plaintiff's Ex. G) in a different

16  fashion); *Id.* at 1088-89, ln. 15-14 (recruiters vary as to how they arrange interview and handle

17  follow up calls); *Id.* at 1090-91, ln. 20-3 (it is "not mandatory" to follow the SOP); Rodrigues

18  depo., Ex. WWW at 1096-97, ln. 22-1; *Id.* at 1098, ln. 1-4 (with respect to interviews, Kelly does

19  not have consistent practices throughout its branch offices in California).

20  With respect to the handling of resumes, Kelly's branch employees typically follow the

21  wishes of the customers, and not Kelly, in determining whether to "brand" resumes by inserting

22  the Kelly logo onto employee resumes. *See* Bhalla decl., Ex. SSS at 1069-72, ¶ 5 ("Some clients

23  refuse to allow Kelly to put its name on a candidate's resume. It is different from client to

24  client."); Leatherman decl., Ex. JJJ at 1029-33, ¶ 10 ("Some customers will not let us put Kelly

25  letterhead on the candidate's resume."); Burns decl., Ex. LLL at 1039-43, ¶ 11 (customers "quite

26  frequently" employ "vendor-neutral" tools to ensure that the managers who interview and select

27  temporary employees do not know which agency the employees are affiliated with).

28  Nor do Kelly's branch employees uniformly follow Kelly interview checklists or other

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

7

CV 08-03893 CW

1   guidelines.  *See* Wells decl., Ex. HHH at 1018-22, ¶ 19 (staffing manager does not follow any

2   type of interview checklist); Aikin decl., Ex. RRR at 1065-68, ¶ 11 (recruiter not familiar with

3   any interview checklist; stating, "I follow my own style that I've found successful over the

4   years."); Arnone decl., Ex. MMM at 1044-48, ¶ 10 ("I do not use the checklist on mykelly.com.");

5   Wilhite decl., Ex. NNN at 1049-52, ¶ 12 ("From my experience . . . I do not believe that the

6   interview checklist on mykelly.com is being followed on a regular basis.  Some Recruiters may

7   use it as a general guideline; others may not even look at it.  Recruiters develop their own style.").

8        **6.        The Duration of Interviews Varies Widely; Some Last Only a Few Minutes.**

9        Not surprisingly, because interviews are controlled by customers whose practices and

10  preferences differ, and are attended by applicants whose backgrounds and styles are unique,

11  interview lengths also vary widely, from as little as a few minutes to much longer.  *See* Wells

12  decl., Ex. HHH at 1018-22, ¶ 7 (Length of interviews varies according to hiring manager, from

13  "less than 15 minutes" to 1 hour); Noguera decl., Ex. PPP at 1056-59, ¶ 11 ("The length of

14  interviews varies a lot . . . .  It depends on whether it is a phone or in person interview, it depends

15  on the client, and it depends on the particular position and its responsibilities."); Arnone decl., Ex.

16  MMM at 1044-48, ¶ 14 ("The length of interviews varies tremendously – it depends on the

17  number of interviewers, the type of position (e.g. admin) and the hiring manager . . . .  If it is a

18  lower level position, the interview might last 15 minutes."); Saltsman decl., Ex. GGG at 1013-17,

19  ¶ 13 ("The lengths of interviews vary.  Some interviews last just 20 minutes – the client just wants

20  to do a 'meet and greet' and does not really ask any questions."); Santos decl., Ex. KKK at 1034-

21  38, ¶ 6 (some interviews are as little as a 15 minute phone conversation); Burns decl., Ex. LLL at

22  1039-43, ¶ 15 ("The length of interviews at clients is 10-30 minutes on average but it varies.");

23  Facundo decl., Ex. QQQ at 1060-64, ¶ 18 ("Sometimes, a hiring manager just has one or two

24  questions and that's it.").  "Some interviews might last just 10 minutes, depending on the client

25  and the position." Fridblom decl., Ex. ZZ at 985-87, ¶ 7.  "Some interviews are as short as 7-10

26  minutes." Tost decl., Ex. WW at 971-75, ¶ 12.  Some might last as little as five minutes.  Klein

27  decl., Ex. AAA at 988-94, ¶ 15.

28

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

8

CV 08-03893 CW

7.   **There is Little or No Evidence of Employee Discipline Arising From Interview Conduct.**

Plaintiff also repeatedly implies that Kelly employees might be subject to discipline arising from their conduct during interviews, but plaintiff's representations to this Court again seem overzealous and are unsupported by the cited record.  The evidence does show that Kelly, from time to time, shares customer feedback with employees (to common-sensically help them improve their interview skills), but to describe that post-interview communication as "discipline" is hyperbole.  *See, e.g.,* Ex. JJ, 720-22, 729-33, 736-40 (Kelly staff might relay critiques or complaints received from customers and, if needed, provide general advice on how to improve interview skills); Ex. MM, 794-806 (Kelly provides general feedback – i.e., show up on time to interviews); Ex. II, 686-87, 690-91 (Kelly "counsels" employees following interviews, but does not address the substance of that "counseling" or whether it is truly disciplinary in nature); Ex. R, 255, 264-65, 278-79 (Kelly generally debriefs employees after customer interviews, but only in regard to how the interview went generally and whether the temporary employee wishes to pursue an assignment with the customer); Ex. I (Kelly candidate development tool form provides general interview advice); Ex. LL (Kelly employee handbook – same).

There is simply no evidence of any widespread or systematic disciplinary action taken by Kelly in connection with temporary employee placement interviews.  The evidence instead shows the opposite – that interview-related discipline happens somewhere between extremely rarely and never.  *See, e.g.,* Wells decl., Ex. HHH at 1018-22, ¶ 8 (staffing manager with ten years' experience has never disciplined an employee in connection with an interview); Bhalla decl., Ex. SSS at 1069-72, ¶ 13 (never disciplined an employee for interview conduct); Wilhite decl., Ex. NNN at 1049-52, ¶ 10 (manager unaware of "any instance" of a Kelly employee being disciplined for behavior on an interview).

8.   **Some Customers Conduct Interviews of Kelly Employees/Applicants on Their Own, With No Involvement by Kelly, And Notify Kelly Only After the Interview Has Occurred.**

Customers sometimes recruit and interview candidates on their own, without any

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

9

CV 08-03893 CW

1   involvement by Kelly whatsoever.  This can occur when the customer wishes to fill a position, but

2   does not wish to become the "employer" for payroll purposes.  So the customer recruits and

3   interviews candidates, then refers the candidates it selects to Kelly and asks Kelly to hire the

4   employee and assign them to work for the customer.  In these situations, the customer is

5   essentially asking Kelly to act as the "payroll agent" for the employee.  *See, e.g.,* Boruff decl., Ex.

6   III at 1023-28, ¶ 7; Burns decl., Ex. LLL at 1039-43, ¶ 6; Lazaro decl., Ex. FFF at 1010-12, ¶ 7;

7   Klein decl., Ex. AAA at 988-94, ¶ 21.  *See also* Merri depo., Ex. VVV at 1085, ln. 2-6

8   (employees may arrange interviews with customers directly, bypassing Kelly).

9          **9.     Some Interviews are for Temp-To-Hire Situations in Which the**

10                 **Employee/Applicant is Actually Interviewing for a Permanent Position With**

11                 **the Customer.**

12          Customers sometimes ask Kelly to serve as a recruiter in temp-to-hire situations.  In these

13   situations, the customer asks Kelly to provide an applicant or temporary employee to interview for

14   a position where there is an expectation, or at least the potential, to be hired by the customer as a

15   permanent employee.  Boruff decl., Ex. III at 1023-28, ¶ 9.  Temp-to-hire interviews tend to be

16   more thorough and take longer, and may involve the customer testing the employee/applicant on

17   his or her professional capabilities.  Santos decl., Ex. KKK at 1034-38, ¶ 11.

18          But even assignments not formally designated as temp-to-hire can result in the customer

19   hiring the employee as a permanent, full-time employee.  Boruff decl., Ex. III at 1023-28, ¶ 9.  It

20   is not uncommon for customers to interview and even negotiate with Kelly temporary employees

21   during an assignment, without Kelly's knowledge, and then hire them as full-time employees,

22   notifying Kelly only after they have reached an agreement.  Leatherman decl., Ex. JJJ at 1029-33,

23   ¶ 20.  In these situations, Kelly has no way of knowing in advance that the customers are

24   interviewing Kelly employees.  *Id.*

25   **III.  CLASS CERTIFICATION SHOULD BE DENIED BECAUSE PLAINTIFF HAS**

26         **FAILED TO SATISFY HER BURDEN OF PROOF UNDER RULE 23**

27   **A.     Discussion of Applicable Law.**

28          **1.     Required Elements of Rule 23.**

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

10

CV 08-03893 CW

1   A class action should not be certified unless the plaintiff satisfies all four of the threshold

2   requirements of Rule 23(a):  (1) numerosity – that the class is so numerous that joinder of all

3   members is impracticable; (2) commonality – that there are questions of law or fact common to

4   the class; (3) typicality – that the claims of the representative parties are typical of the claims of

5   the class; and (4) adequacy – that the representative party and her counsel will fairly and

6   adequately protect the interests of the class. Fed.R.Civ.P. 23(a); *Zinzer v. Accufix Research*

7   *Institute, Inc.,* 253 F.3d 1180, 1186, *amended* 273 F.3d 1266 (9th Cir. 2001).

8   In addition to the four requirements of Rule 23(a), a plaintiff must also establish that at

9   least one of the three requirements of Rule 23(b) is met. Here, plaintiff seeks to certify a class

10   under Rule 23(b)(3). Motion, 13:20-22. Under Rule 23(b)(3), a class may be certified where "the

11   court finds that the questions of law or fact common to class members predominate over any

12   questions affecting only individual members, and that a class action is superior to other available

13   methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ. 23(b)(3). "The

14   predominance inquiry of Rule 23(b)(3) asks whether proposed classes are sufficiently cohesive to

15   warrant adjudication by representation." *In re Wells Fargo Home Mortgage Overtime Pay Litig.,*

16   571 F.3d 953, 957 (9th Cir. 2009); *Local Joint Executive Bd. of Culinary/Bartender Trust Fund v.*

17   *Las Vegas Sands, Inc.,* 244 F.3d 1152, 1162 (9th Cir. 2001) (citation omitted). The focus is on

18   "the relationship between the common and individual issues." *Hanlon v. Chrysler Corp.,* 150

19   F.3d 1011, 1022 (9th Cir. 1998) (citation omitted). To satisfy the superiority requirement, a

20   plaintiff must demonstrate a tenable method for trying the case that avoids extensive individual

21   mini-trials. *Wells Fargo Home Mortgage Overtime Pay Litig.,* No. C 06-01770, 2010 WL

22   174329 at *9 (N.D. Cal. Jan. 13, 2010).

23       **2.**   **Plaintiff Bears the Burden of Proving Each Element by a Preponderance of**

24           **the Evidence.**

25   The plaintiff must present *facts* sufficient to satisfy the Rule 23(a) and (b) requirements.

26   *Doninger v. Pacific Northwest Bell, Inc.,* 564 F.2d 1304, 1308-09 (9th Cir. 1977). Class

27   certification is proper only "if the trial court is satisfied, after a rigorous analysis, that the

28   requisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161 (1982).

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

11

CV 08-03893 CW

1  If the district court is not fully satisfied, certification should be denied. *Id.*

2  It is well recognized that "the class determination generally involves considerations that

3  are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 160

4  (citation omitted). "A district court must formulate some prediction as to how specific issues will

5  play out in order to determine whether common or individual issues predominate in a given case."

6  *In re Hydrogen Peroxide Antitrust Litigation,* 552 F.3d 305, 311 (3rd Cir. 2008).

7  To certify a class, the district court must find that the evidence more likely than not

8  establishes each fact necessary to meet Rule 23's requirements. *Id.* at 320. "A party seeking class

9  certification must show under a strict burden of proof that all four requirements are clearly met."

10  *Quinn v. Nationwide Ins. Co.,* 281 Fed. Appx. 771, 775 (10th Cir. 2008) (citation omitted).

11  **B.    Plaintiff Has Failed to Present Facts to Satisfy the Numerosity, Commonality, and**

12  **Typicality Requirements of Rule 23(a).**

13  **1.    Plaintiff has Failed to Establish Facts to Show Numerosity.**

14  "One or more members of a class may sue or be sued as representative parties on behalf of

15  all only if . . . the class is so numerous that joinder of all members is impracticable . . . ."

16  Fed.R.Civ.P. 23(a)(1). "While plaintiff need not allege the exact number or identity of class

17  members, mere speculation of the number of class members involved does not satisfy the

18  requirement of Rule 23(a)(1)." *In re LDK Solar Sec. Litig.,* 255 F.R.D. 519, 525 (N.D. Cal.

19  2009).

20  Here, to show numerosity plaintiff simply asserts that since "[t]here is evidence that

21  approximately 50% of Kelly's customers required interviews with Kelly temporary employees

22  prior to offering an assignment," that "Kelly has employed approximately 150,000 temporary

23  employees in California during the proposed class period," and that "it is reasonable to estimate"

24  that "approximately 75,000 individuals went on at least one interview." Motion, 15-16:26-5.

25  Plaintiff's assumptions and analysis are surprisingly ill-conceived, on multiple fronts.

26  First, plaintiff has failed to show any correlation between the number of Kelly *customers*

27  that require interviews, and the number of Kelly *employees* who attended interviews. Plaintiff

28  apparently assumes that the two numbers must be proportionally related, without any evidence or

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

12

CV 08-03893 CW

1    analysis whatsoever.  This is "an inappropriate arithmetic conclusion about the potential class

2    size."  Parker decl., Ex. TT at 920-60, ¶¶ 7-8.

3           Second, as noted above, although plaintiff seeks to limit the class definition to "temporary

4    employees" (those individuals who have actually begun working on at least one assignment),

5    plaintiff's proposed mathematical formula fails to distinguish or even account for Kelly's current

6    and former employees who participated in placement interviews *before* they began their first

7    assignment, and therefore *before* they became employees.  Parker decl., Ex. TT at 920-60, ¶ 9.

8           Mere allegations of numerosity – without proof showing the existence of specific class

9    members – are insufficient to satisfy Rule 23(a)(1)'s numerosity requirement as a matter of law.

10   *LeGrand v. NYC Transit Authority,* 1999 WL 342286 (E.D.N.Y. May 26, 1999) (court refused to

11   certify class in pregnancy discrimination case, holding that plaintiff's naked assertion that 100

12   other members were adversely affected by the policies, had no factual support, such as the number

13   of conductors and operators who were actually pregnant); *Roe v. Highland,* 909 F.2d 1097, 1100

14   n. 4 (7th Cir. 1990) ("[M]ere speculation as to the number of parties involved is not sufficient to

15   satisfy Rule 23(a)(1)."); *Harper, et al. v. Ulta Salon Cosmetics & France, Inc.,* 2005 WL

16   3542482, at *2 (N.D. Ga. Dec. 23, 2005) (Plaintiffs asserted [in their memorandum of law in

17   support of their motion for class certification] that they did not know the size of their purported

18   class but argued that it ought to include the number of African-Americans in the metropolitan

19   Atlanta area that were either currently employed by the defendant or who applied and were denied

20   employment; the court denied plaintiffs' motion for class certification because of their failure "to

21   provide any evidence as to the number of members . . . in such a class."); *see also Celano v.*

22   *Marriott Intl., Inc.,* 242 F.R.D. 544, 545-550 (N.D. Cal. 2007) (where plaintiffs requested the

23   Court to make "common sense inferences" on the size of the class, plaintiffs' showing was

24   insufficient because it was based on "rank speculation untethered to the real facts.").

25          Plaintiff has failed to meet her burden under Rule 23(a)(1).

26   **2.      Plaintiff has Failed to Establish Facts to Show Commonality.**

27          "One or more members of a class may sue or be sued as representative parties on behalf of

28   all only if . . . there are questions of law or fact common to the class . . . ."  Fed.R.Civ.P. 23(a)(2).

1   Here, plaintiff is unable to satisfy her burden under Rule 23(a)(2).  Although plaintiff has alleged

2   the existence of a "uniform policy and practice," the existence of a uniform policy is not sufficient

3   to meet the requirements of common questions of law and fact necessary for class certification

4   under Rule 23(a)(2).[2]

5           Plaintiff has failed to present evidence to show a reliable method of ascertaining which of

6   Kelly's current and former temporary employees meet the criteria for membership in the proposed

7   class.  And, among those employees who might meet the criteria (e.g., who attended at least one

8   placement interview), plaintiff has failed to show that common facts exist with respect to those

9   interviews that would allow the Court to determine, on a class-wide basis, whether Kelly

10  exercised such "control" over the time spent in the interviews as to render the time compensable.

11  As shown above, each individual class member is likely to present a different set of

12  circumstances, such that this Court could not thoughtfully or fairly make a single determination

13  regarding the "control" factor on a class-wide basis.  Plaintiff has therefore failed to meet her

14  burden to prove commonality.

15          **3.     Plaintiff has Failed to Establish Facts to Show Typicality.**

16          Rule 23(a)(3) requires the claims or defenses of the representative party to be "typical of

17  the claims or defenses of the class."  Fed.R.Civ.P. 23(a)(3).  The test for typicality is "whether

18  other members have the same or similar injury, whether the action is based on conduct which is

19  not unique to the named plaintiffs, and whether other class members have been injured by the

20  same course of conduct."  *Hanon v. Dataprods. Corp.,* 976 F.2d 497, 508 (9th Cir. 1992) (internal

21  citations omitted).  A plaintiff is not typical where she and the putative class face different

22  defenses.  *Id.*  Moreover, the typicality requirement seeks to determine "whether the named

23  plaintiff's claim and the class claims are so interrelated that the interests of the class members will

24  be fairly and adequately protected in their absence."  *Gen. Tel. Co. of the Southwest v. Falcon,*

25  *supra,* 457 U.S. at 158 at n. 13.  Thus, "[t]he purpose of the typicality requirement is to assure that

26  the interest of the named representative aligns with the interests of the class."  *Hanon, supra,* 976

27

28

_____

[2] Moreover, as is explained above and below, there is no such "uniform policy and practice" at all.

1   F.2d at 508 (internal citations omitted).

2   　　　Here, plaintiff attended several placement interviews with Kelly customers.  As noted

3   above, plaintiff has failed to provide sufficient evidence to reliably ascertain which other current

4   and former temporary employees may have attended placement interviews, whether those

5   interviews occurred before or after the individuals became employees, and whether the

6   circumstances surrounding those interviews indicate a similar, class-wide level of control by

7   Kelly that would allow this Court to adjudicate the case on a class-wide basis.  Accordingly,

8   plaintiff has not met her burden of proving that her claims are typical of the proposed class, as

9   required by Rule 23(a)(3).

10  **C.   Plaintiff Has Failed to Satisfy the Predominance and Superiority Requirements of**

11  　　　**Rule 23(b)(3).**

12  　　　**1.   Plaintiff Has Failed to Present a Tenable Trial Plan.**

13  　　　Plaintiff has initially failed to satisfy Rule 23(b)(3) because she hasn't presented the

14  necessary, manageable trial plan.  Most importantly, she has failed to show that the interview time

15  claim can be subject to class-wide proof, and therefore litigated on a class-wide basis without

16  avoiding extensive mini-trials.

17  　　　The key issue under Rule 23(b)(3) is whether or not plaintiff's claims can be litigated

18  using common proof, i.e., whether plaintiff can present evidence sufficient to identify which

19  employees attended placement interviews with Kelly customers, and whether those employees

20  who did attend interviews engaged in compensable activities such that they must be paid for their

21  participation.  To decide this issue, the Court would need to determine which class claims, issues,

22  or defenses can actually be tried – and how – using common proof; a class cannot be certified if

23  trial of the claims on a class-wide basis "would present intractable management problems."

24  *Amchem Prods, Inc. v. Windsor,* 521 U.S. 591, 620 (1997).  Judicial economy is not served by

25  joining disparate claims together, as it quickly becomes "a monster that no one can deal with."

26  *EEOC v. MCI Int'l, Inc.,* 829 F.Supp 1438, 1445-46 (D.N.J. 1993).  Furthermore, certification of

27  a class is a serious matter because, by its very nature, class litigation "can alter the usual dynamics

28  of litigation and bring to bear on defendants . . . intense pressure to settle." *American National*

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

15

CV 08-03893 CW

1   *Fire Insurance Co. v. York County,* No. 08-2439, 2009 WL 2385464, *1 (1st Cir. 2009).

2   **2.      The Class is Not Readily and Reliably Ascertainable.**

3          Where, as here, a plaintiff fails to properly define an identifiable class seeking relief, the

4   Court should deny certification even prior to examining the standards of Rule 23. Federal courts

5   have held that "[t]he requirement of ascertainability, though not expressly mentioned in Rule 23,

6   is fundamental," and an implied requirement for maintaining a class. *See McBean v. City of New*

7   *York,* 260 F.R.D. 120, 132-33 (S.D.N.Y. 2009). Although the ascertainability requirement need

8   not be met prior to class certification, it must be met "at some point in the case." *In Re IPO*

9   *Securities Litig.,* 471 F.3d 24, 45 (2d Cir. 2006). Because the requirement must be met eventually

10  and because confronting the issue early on can preserve judicial resources, most courts prefer to

11  treat ascertainability as a threshold requirement (*See Dunnigan v. Metropolitan Life Ins. Co.,* 214

12  F.R.D. 125, 135 (S.D.N.Y. 2003)) because "a vague class definition portends significant

13  manageability problems for the court." *Rink v. Cheminova,* 203 F.R.D. 648, 660 (M.D. Fla.

14  2001).

15         "[W]here a threshold inquiry is necessary to determine class membership, the benefits to

16  proceeding as a class action are eviscerated [and] class certification is not beneficial." *Mike v.*

17  *Safeco Ins. of America,* 223 F.R.D. 50, 54 (D. Conn. 2004) Likewise, where a class definition

18  requires a court to conduct mini-hearings underlying each proposed class member's

19  circumstances, certification is not proper because of the difficulties in defining membership in the

20  class. *See Coleiro v. Spartan Stores, Inc.,* No. 02-150, 2004 WL 3951586, *2 (W.D. Mich. Aug.

21  16, 2004) (denying motion for certification where the plaintiff failed to adequately define the

22  proposed class; each class member would require "piecemeal litigation" to determine whether

23  [they were] actually a member of the class, which "would add not only confusion to this case, but

24  require significant litigation and certainly would not aid in the efficient administration of

25  justice."); *In re Wal-Mart Wage and Hour Empl. Prac. Litigation,* 2008 WL 3179315 *20 (D.

26  Nev. June 20, 2008) ("[N]o one would be able to determine who was a class member until it had

27  been determined through individualized inquiry that in fact Wal-Mart had failed to compensate a

28  particular employee"). *Brown v. FedEx Corp.,* 249 F.R.D. 580, 587-588 (C.D. Cal. 2008).

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

16

CV 08-03893 CW

Intractable individual inquiries exist as to ascertainability, including:

- Whether any particular temporary employee attended a placement interview with any Kelly customer.  Plaintiff acknowledges that this information is not available, and proposes that a "short questionnaire" be mailed to Kelly's current and former temporary employees, and that "each temporary employee can report whether they attended at least one interview with a Kelly customer during the class period, thereby identifying themselves as class members or not." Motion, 15:2-5.  As shown in Section III.C.3 below, such a process would be, at best, unfair and unreliable.

- Whether any particular placement interview occurred before the temporary employee's first assignment (when it was undisputed that the potential employee was not yet an "employee" and therefore not a class member), or after the employee began his or her first assignment (and therefore met the definition of an "employee"), or perhaps while the between-assignments employee was interviewing on behalf of another staffing company.  Plaintiff fails to address these issues at all.

**3.     Plaintiff's Proposed Questionnaire is Unreliable for Ascertaining the Class or to Resolve Other Issues.**

In her motion, plaintiff acknowledges, as she must, that she must prove the class is ascertainable in order for this Court to grant class certification.  Motion, 14:6-8.  Yet plaintiff fails to propose a viable plan for doing so.  In fact, the *totality* of plaintiff's proposal for ascertaining the class members is this: "Temporary employees can be easily notified through a post-certification mailing that they are potential class members.  Through a short questionnaire, each temporary employee can report whether they attended at least one interview with a Kelly customer during the class period, thereby identifying themselves as class members or not." Motion, 15:2-5.

Plaintiff has failed to provide a statistical report or any other evidence that such a questionnaire would allow this Court to fairly and reliably determine the composition of the proposed class.  In fact, as discussed below, and in the accompanying declaration of Richard

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

17

CV 08-03893 CW

1   Parker, Ph.D., such a questionnaire would be plagued by a variety of serious, incurable

2   deficiencies.  Among these deficiencies are:

3               **a.    Ambiguity, Confusion, and Recall Error.**

4        Plaintiff's proposed questionnaire, which asks only whether the employee attended at least

5   one interview with a Kelly customer during the class period, is ambiguous and likely to generate

6   confusion.  The questionnaire does not inquire whether the interview occurred *before* the

7   employee began working on an assignment for Kelly – and thus was an applicant, not an

8   employee (*See* Motion, 1 at fn. 3) and therefore would be ineligible for inclusion in the proposed

9   class (*See* class definition at Motion, 14:1-2) – or whether the interview occurred *after* the

10  individual began working an assignment and therefore was truly an employee.  The questionnaire

11  is therefore likely to result in individuals who interviewed when they were *applicants* incorrectly

12  identifying themselves as *employees*.  *See* Parker decl., Ex. TT at 920-60, ¶ 9.

13       The proposed questionnaire does not consider the fact that many Kelly employees

14  (including plaintiff herself) are registered/employed by multiple staffing companies

15  simultaneously.  Aikin decl., Ex. RRR at 1065-68, ¶ 13; Leatherman decl., Ex. JJJ AT 1029-33, ¶

16  7; Stipulation of Facts, Ex. RR at 889-902, ¶ 17.  Employees who worked for multiple staffing

17  agencies simultaneously are unlikely to accurately recall, years after the event, which staffing

18  agency sent them on a particular interview.  Parker decl., Ex. TT at 920-60, ¶ 17(b).

19       The proposed questionnaire also does not consider the probability of recall error.  It is

20  scientifically accepted that the average person's ability to recall events several months ago, let

21  alone years ago, is quite limited, and this must be taken into account in the design of any survey.

22  Parker decl., Ex. TT at 920-60, ¶ 17(a).

23       The proposed questionnaire also does not consider the natural tendency of respondents to

24  overestimate occurrences of past events, a tendency that increases as the length of the recall

25  period increases.  Parker decl., Ex. TT at 920-60, ¶ 17(c).

26              **b.    Self-Interest Bias.**

27       Plaintiff also does not present any plan for dealing with the problem of self-interest bias

28  among the questionnaire respondents.  This is a scientifically-recognized problem that would

1   likely render the data obtained from the questionnaire unreliable. *See* Parker decl., Ex. TT at 920-

2   60, ¶¶ 13-16 and ¶ 18(a).  The problem of self-interest bias would require Kelly to assert its right

3   to depose and/or cross-examine individual respondents in order to ascertain the accuracy and

4   veracity of their responses (Parker decl., Ex. TT at 920-60, ¶ 29(a)), resulting in a necessary host

5   of mini-trials that – by itself – would make a class action unworkable.

6            **c.       Non-Response Bias.**

7            Another problem that would almost certainly arise from the use of plaintiff's proposed

8   questionnaire is non-response bias – the likelihood that most of the employees who receive the

9   questionnaire are unlikely to respond, as response rates for questionnaires are generally quite low,

10  with far more non-respondents than respondents.  Parker decl., Ex. TT at 920-60, ¶ 20.  This

11  renders data obtained from such a questionnaire unreliable and unusable as representative of the

12  population.  Parker decl., Ex. TT at 920-60, ¶ 29(c).

13           **d.       Lack of Representativeness/Sampling Error.**

14           Given the near-certainty of a low response rate were this Court to adopt plaintiff's

15  questionnaire plan, it does not require much imagination to predict that plaintiff would then

16  propose using statistics generated from the small number of responses, and then to attempt to

17  generalize and extrapolate those statistics to the large majority of employees who did *not* respond

18  to the questionnaire.  Such an approach would be scientifically unsound because, in addition to

19  the errors described above, the data obtained from the near-certain low response rate would not

20  result in a representative, random sample.  Parker decl., Ex. TT at 920-60, ¶ 19.  That is, the

21  relationship between self-interest bias and non-response bias would dramatically skew the result.

22  Parker decl., Ex. TT at 920-60, ¶¶ 20-29.

23           Put simply, respondents to any questionnaire are very likely to be skewed toward those

24  who perceive that their interest is greatest, i.e., those who have the most to gain if they respond.

25  Parker decl., Ex. TT at 920-60, ¶ 22.  This is especially true, and creates an insurmountable error,

26  where, as plaintiff seeks here, current and former temporary employees will know that they will

27  not qualify for additional compensation if they deny attending any placement interviews, but that

28  they may very well qualify for monetary compensation if they respond positively.  Parker decl.,

1  Ex. TT at 920-60, ¶ 23.

2       This problem would be compounded if the questionnaire is expanded beyond the single

3  question that plaintiff proposes – whether the individual attended a placement interview – to

4  obtain additional information to clarify the circumstances of the interview or to assess damages.

5  Such questions might include whether the interview occurred before the employee began working

6  on an assignment (which would be necessary to distinguish whether the employee was then an

7  employee and therefore would potentially qualify for class membership, or merely an applicant

8  who would not), for which customer(s) did the employee/applicant interview, whether the

9  employee/applicant was concurrently working for any other staffing agency(ies), how many

10 interviews were attended, the length of each interview, and other relevant questions.  As the

11 amount of detail requested by the questionnaire increases, the response rate can be expected to

12 decrease.  Parker decl., Ex. TT at 920-60, ¶ 24.  The other errors described above, including recall

13 error and other errors affecting the reliability of the data obtained, would also be expected to

14 increase.  Parker decl., Ex. TT at 920-60, ¶ 25.

15      The fundamental problem with using any data generated from the proposed questionnaire

16 to generate statistics or generalizations is that the sample from which the data is drawn – a self-

17 selected group of individuals who believe they may be entitled to financial compensation based

18 on their responses – is not random and, therefore, is not reliable.  Parker decl., Ex. TT at 920-60, ¶

19 26.  And, even if a random sample could somehow be targeted to receive a questionnaire (which

20 plaintiff has not even proposed), the respondents to such a randomly-selected sample would still

21 be self-selecting, resulting in an unreliable data set.  Parker decl., Ex. TT at 920-60, ¶¶ 26-28.

22      In sum, plaintiff's proposed ascertainability process would be unable to reliably ascertain

23 the class or provide any other reliable, useful data to justify trying this case on a class-wide basis.

24      **4.**    **Even if the Class Could be Ascertained, Individual Issues as to Liability**

25             **Would Predominate.**

26      This Court has already held in this case that the "control test" is the proper test for

27 determining whether interview time is compensable, and acknowledged that **"[t]he level of an**

28 **employer's control over its employee's activities is a fact-specific determination."**  Order

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

20

CV 08-03893 CW

1  Granting in Part Defendant's Motion for Summary Judgment and Granting in Part Plaintiff's

2  Cross Motion for Summary Judgment, October 16, 2009, at 8:1-3.  Thus, even if the class

3  membership could be reliably ascertained – which it can't – the fundamental liability issue in this

4  case – whether the time spent in placement interviews constitutes compensable "hours worked" –

5  turns on the level of control that Kelly exercised (or did not exercise) over placement interviews.

6  The "fact-specific inquiry determination" needed to establish the level of control over particular

7  employee interviews will, perhaps by definition, require inquiry into individual issues as a matter

8  of law.  These include:

9    • Whether the customer, Kelly, or both decided the employee/applicant was

10     appropriate to interview, and to what extent the decision was the customer's,

11     Kelly's, or both;

12    • Whether the employee/applicant specifically requested the interview, and/or

13     contacted the customer on his/her own;

14    • Whether the employee/applicant attended the interview on a voluntary basis or, as

15     plaintiff implies, under circumstances tantamount to coercion, and to what degree;

16    • Whether the employee/applicant had other options available, i.e., whether another

17     assignment not requiring a placement interview was available or potentially

18     available;

19    • Whether and to what extent the employee/applicant was trained or coached as to

20     his or her demeanor/behavior during the interview, and/or what to say to the

21     interviewer;

22    • Whether the interview was a simple placement interview limited to standard

23     interview-type questions, or took on the character of a "working" interview or

24     otherwise included activities that might (or might not) be considered compensable

25     work;

26    • Whether, based on the employee/applicant's qualifications and the customer's

27     needs, declining to participate in the interview would have precluded the

28     employee/applicant from other opportunities with that customer, or from other

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

21

CV 08-03893 CW

1    opportunities with other customers;

2    • Whether the interview was conducted face-to-face or over the telephone;

3    • Whether the employee/applicant was given an opportunity to negotiate any terms

4    of the potential assignment, or was presented with a simple take-it-or-leave-it

5    situation;

6    • Whether the employee/applicant was subject to discipline in connection with

7    his/her interview conduct;

8    • Whether time spent at the interview was substantial, or rather was *de minimis* time

9    and therefore not compensable. *See, e.g., Lindow v. United States,* 738 F.2d 1057,

10   1062 (9th Cir. 1984) (finding daily periods of ten minutes *de minimis*); *See also*

11   Klein decl., Ex. AAA at 988-94, ¶ 15 (interviews can last as little as five minutes);

12   Facundo decl., Ex. QQQ at 1060-64, ¶ 18 (interviews may consist of just one or

13   two questions);

14   • Whether the interview was for a simple temporary placement, or was a temp-to-

15   hire situation where the employee was interviewing for the opportunity to gain

16   permanent, full-time employment with the customer;

17   • Whether the employee/applicant was working for other staffing agencies

18   concurrently with working for Kelly;

19   • *What happened in the interview itself, and whether Kelly controlled some, or any,*

20   *part of the employee/candidate's time and, if so, how it did so.*

21   The various circumstances that apply to any particular class member could give rise to

22   numerous defenses as to liability and/or damages, which implicate Kelly's fundamental cross-

23   examination rights, which issues cannot be dealt with on a class-wide basis. *See, e.g., Sepulveda*

24   *v. Wal-Mart Stores, Inc.,* 237 F.R.D. 229 (C.D. Cal. 2006) (individualized defenses cannot be

25   handled on a class-wide basis). *Cf. Johnson, et al. v. Big Lot Stores, Inc.,* 561 F.Supp.2d 567, 587

26   (E.D. La. 2008) (decertifying an FLSA collective action based partially on procedural fairness

27   considerations because "it would be an injustice to proceed to a verdict on the merits that results

28   in a binding class wide ruling based on such disparate evidence").

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

22

CV 08-03893 CW

5.   **The Existence of a Common Policy Does Not Establish Predominance for Purposes of Rule 23(b)(3).**

To support her commonality and predominance arguments, plaintiff relies heavily on her allegation that Kelly had a common and "uniform" policy and practice regarding interviews, and that this common question is enough to satisfy her evidentiary burden.  Yet she ignores the real predominance test – whether common questions predominate such that liability can be proven for the entire class.  The party seeking certification must establish that "common questions present a significant aspect of the case and . . . can be resolved for all members of the class in a single adjudication." *Hanlon, supra,* 150 F.3d at 1022.

It is irrelevant for class certification whether Kelly treated everyone in the putative class similarly pursuant to a policy (which it didn't).  *See, e.g., In re Wells Fargo Overtime Pay Litig., supra,* 571 F.3d at 959 (it is an abuse of discretion to certify a class based on a common classification:  "Wells Fargo's uniform exemption policy says little about the main concern in the predominance inquiry: the balance between individual and common issues."); *Vinole v. Countrywide Home Loans, Inc.,* 571 F.3d 935, 946 (9th Cir. 2009) ("we hold that a district court abuses its discretion in relying on an internal uniform exemption policy to the near exclusion of other factors relevant to the predominance inquiry").  Rather, class certification must be denied, among other reasons, because plaintiff cannot show that critical common questions, to the extent they exist, can be answered on a class-wide basis.

Though *In re Wells Fargo Overtime Pay Litig.* and *Vinole* both involved common, uniform exemption policies, the same principles discussed at length there apply to the alleged common, uniform interview pay policy upon which plaintiff seeks to rely here.  In a very recent ruling denying class certification, the district court in *In re Wells Fargo Home Mortgage Overtime Pay Litig.,* No. C 06-01770 MHP, 2010 WL 174329 (N.D. Cal. Jan. 13, 2010), explained why such uniform policies do not, in and of themselves, satisfy the predominance requirement, even where the members of the proposed class were subject to a common classification, common job descriptions, uniform training, and the same primary goal (to sell mortgages), uniform job expectations, similar compensation plans, and standardized employee standards. *Id. at *7.*

1   Despite that uniformity, the court nevertheless denied class certification because – as here – the

2   employer's defense would require "fact-intensive inquiries" into how individual class members

3   performed their jobs, and that the complexity of those inquiries must factor into the court's

4   predominance analysis. *Id.* As the court explained:

> *In re Wells Fargo* and *Vinole* also make clear that a plaintiff could
> satisfy the predominance requirement by coming forward with some
> form of common proof that would absolve this court from inquiring
> into how each HMC spent their working day.  Plaintiff has not,
> however, done so.  She has not produced (or even alleged the
> existence of) any policy that requires HMCs to spend a specified
> amount of time in or out of the office.  At the very least, to
> determine if each HMC qualified for the outside sales exemption
> the court would need to conduct "inquiries into how much time
> each individual HMC spent in or out of the office and how the
> HMC performed his or her job, all of this where the HMC was
> granted almost unfettered autonomy to do his or her job." *Vinole*,
> 571 F.3d at 947.  Those inquiries would inevitably consume the
> majority of the trial, and overwhelm the adjudication of common
> issues.

13   *Id.*

14        This Court is presented a far more compelling reason to deny class certification here,

15   where the Court has already ruled that the compensability of interview time is a "fact-specific

16   determination" into whether/how Kelly "controlled" the temporary employee's conduct or

17   activities at the placement interview – which is by its very nature an individualized, "fact-

18   specific" inquiry.  Order Granting in Part Defendant's Motion for Summary Judgment and

19   Granting in Part Plaintiff's Cross Motion for Summary Judgment, October 16, 2009, at 8:1-3.

20        **6.     Plaintiff Fails to Present Any Plan for Adjudicating Damages.**

21        In addition to the lack of fair, reliable class-wide proof on liability issues, a similarly fatal

22   defect exists for damages.

23        It is axiomatic that each class member is entitled only to the amount of damages actually

24   incurred. *See Aiello v. Providian Fin. Corp.,* 239 F.3d 876, 881 (7th Cir. 2001) (holding case

25   "not suitable for class action treatment because of the variance in injury among the members of

26   the class").  Any damages for unpaid wages arising from interview time cannot be proven through

27   a formula, total damages pool, or through any method without reviewing data specific to each

28   individual class member.  Moreover, it is undisputed that interview lengths varied widely, such

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

24

CV 08-03893 CW

1   that a fact-specific determination would be necessary to prove damages.  (See Section II.E.6

2   above.)  Therefore the issue of damages and injury are inappropriate for class-wide proof as a

3   matter of law.  *See, e.g., McLaughlin v. Am. Tobacco Co.,* 522 F.3d 215, 223-30 (2d Cir. 2008);

4   *Poulos v. Caesars World, Inc.,* 379 F.3d 654, 658, 666 (9th Cir. 2004).  Once again, plaintiff has

5   not even attempted to address this issue.

6        By all but ignoring the issue of damages, plaintiff's proposed class action is essentially an

7   impermissible request for a fluid recovery.  *See, e.g., McLaughlin v. Am. Tobacco, supra,* 552

8   F.3d at 231 ("We reject plaintiffs' proposed distribution of any recovery they might receive

9   because it offends both the Rules Enabling Act and the Due Process Clause. . . . [A]n aggregate

10  determination [of damages] is likely to result in an astronomical damages figure that does not

11  accurately reflect the number of plaintiffs actually injured by defendants and that bears little or no

12  relationship to the amount of economic harm actually caused by defendants.  This kind of

13  disconnect offends the Rules Enabling Act, which provides that federal rules of procedure, such

14  as Rule 23, cannot be used to 'abridge, enlarge, or modify any substantive right.'").  *See also In re*

15  *Hotel Tel. Charges,* 500 F.2d 86, 90 (9th Cir. 1974) (rejecting a fluid recovery argument because

16  "allowing gross damages by treating unsubstantiated claims of class members collectively

17  significantly alters substantive rights," in violation of the Rules Enabling Act).

## IV.  CONCLUSION

19       Plaintiff has failed to meet her burden of proving, by a preponderance of evidence, that the

20  proposed class involves common questions of law or fact and that these issues predominate, as

21  required by Rule 23.  Rather, this action involves primarily individual "fact-specific

22  determinations."  Plaintiff's motion for class certification should therefore be denied.

23

24  Dated: February 4, 2010              PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP

25                                       By:  /s/ E. Joseph Connaughton
                                              E. JOSEPH CONNAUGHTON
26                                            AARON A. BUCKLEY
                                              DOUGLAS R. CLIFFORD
27                                            Attorneys for Defendant
                                              KELLY SERVICES, INC.

28

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

25                          CV 08-03893 CW