1  E. JOSEPH CONNAUGHTON (SBN 166765)
   jconnaughton@paulplevin.com
2  AARON A. BUCKLEY (SBN 202081)
   abuckley@paulplevin.com
3  DOUGLAS R. CLIFFORD (SBN 231971)
   dclifford@paulplevin.com
4  **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP
   401 B Street, Tenth Floor
5  San Diego, California  92101-4232
   Telephone: 619-237-5200
6  Facsimile: 619-615-0700

7  Attorneys for Defendant KELLY SERVICES, INC.

8

9                    UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA (OAKLAND)

11  CATHERINE SULLIVAN, on behalf of      CASE NO. CV 08-03893 CW
    herself and all others similarly situated,   Related to Case No. CV 07-02784 CW
12
                    Plaintiff,            **CLASS ACTION**
13
          v.                             **DECLARATION OF AARON A. BUCKLEY
14                                        IN SUPPORT OF DEFENDANT KELLY
    KELLY SERVICES, INC.; and DOES 1      SERVICES, INC.'S OPPOSITION TO
15  through 10, inclusive,                PLAINTIFF'S MOTION FOR CLASS
                                          CERTIFICATION**
16                  Defendants.

17
                                         Hearing Date:    No hearing required
18                                        Courtroom:       23
                                         District Judge:  Hon. Claudia Wilken
19                                        Trial Date:      Not set

20

21

22

23

24

25

26

27

28

I, Aaron A. Buckley, declare as follows:

1.    I am a partner with the law firm of Paul, Plevin, Sullivan & Connaughton LLP and am counsel for defendant Kelly Services, Inc. ("Kelly"). I am duly licensed to practice law before all of the Courts of the State of California and the United States District Court for the Northern District of California. I am personally familiar with the following facts and, if called as a witness, could and would testify competently to them.

### DECLARATION OF EXPERT WITNESS

2.    Attached hereto as **Exhibit TT** is a true and correct copy of the declaration signed by Richard A. Parker, Ph.D.

### DECLARATIONS OF OTHER WITNESSES

3.    Attached hereto as **Exhibit UU** is a true and correct copy of the declaration signed by Sandra Ramirez on or about February 1, 2010.

4.    Attached hereto as **Exhibit VV** is a true and correct copy of the declaration signed by Janie Mann on or about February 1, 2010.

5.    Attached hereto as **Exhibit WW** is a true and correct copy of the declaration signed by Jennifer Tost on or about February 1, 2010.

6.    Attached hereto as **Exhibit XX** is a true and correct copy of the declaration signed by Jolanta Buschini in or about February 2010.

7.    Attached hereto as **Exhibit YY** is a true and correct copy of the declaration signed by Monique LeClair on or about January 28, 2010.

8.    Attached hereto as **Exhibit ZZ** is a true and correct copy of the declaration signed by Nicholaus Fridblom on or about February 1, 2010.

9.    Attached hereto as **Exhibit AAA** is a true and correct copy of the declaration signed by Ryan Klein on or about February 1, 2010.

10.    Attached hereto as **Exhibit BBB** is a true and correct copy of the declaration signed by Renee Nations on or about February 2, 2010.

11.    Attached hereto as **Exhibit CCC** is a true and correct copy of the declaration signed by Stephanie Harris on or about February 2, 2010.

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON

BUCKLEY DECLARATION ISO KELLY'S
OPPOSITION TO MOTION FOR CLASS CERT

2

CV 08-03893 CW

1    12.    Attached hereto as **Exhibit DDD** is a true and correct copy of the declaration

2 signed by Susana Jimenez on or about February 2, 2010.

3    13.    Attached hereto as **Exhibit EEE** is a true and correct copy of the declaration

4 signed by Dionne Stokes on or about February 2, 2010.

5    14.    Attached hereto as **Exhibit FFF** is a true and correct copy of the declaration signed

6 by Ninon Lazaro in or about February 2010.

7    15.    Attached hereto as **Exhibit GGG** is a true and correct copy of the declaration

8 signed by Bree Saltsman on or about February 1, 2010.

9    16.    Attached hereto as **Exhibit HHH** is a true and correct copy of the declaration

10 signed by Cathy Wells on or about January 26, 2010.

11    17.    Attached hereto as **Exhibit III** is a true and correct copy of the declaration signed

12 by Amanda Boruff on or about January 25, 2010.

13    18.    Attached hereto as **Exhibit JJJ** is a true and correct copy of the declaration signed

14 by Mary Leatherman on or about January 25, 2010.

15    19.    Attached hereto as **Exhibit KKK** is a true and correct copy of the declaration

16 signed by Patricia Santos on or about January 25, 2010.

17    20.    Attached hereto as **Exhibit LLL** is a true and correct copy of the declaration

18 signed by Michelle Burns on or about January 27, 2010.

19    21.    Attached hereto as **Exhibit MMM** is a true and correct copy of the declaration

20 signed by Thea Arnone on or about January 27, 2010.

21    22.    Attached hereto as **Exhibit NNN** is a true and correct copy of the declaration

22 signed by Alan Wilhite on or about January 27, 2010.

23    23.    Attached hereto as **Exhibit OOO** is a true and correct copy of the declaration

24 signed by Monty Dun on or about January 28, 2010.

25    24.    Attached hereto as **Exhibit PPP** is a true and correct copy of the declaration signed

26 by Rosalle Noguera on or about January 28, 2010.

27    25.    Attached hereto as **Exhibit QQQ** is a true and correct copy of the declaration

28 signed by Arnold Facundo on or about January 28, 2010.

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON

BUCKLEY DECLARATION ISO KELLY'S
OPPOSITION TO MOTION FOR CLASS CERT

3

CV 08-03893 CW

1   26.  Attached hereto as **Exhibit RRR** is a true and correct copy of the declaration

2 signed by Janine Aikin on or about January 28, 2010.

3   27.  Attached hereto as **Exhibit SSS** is a true and correct copy of the declaration signed

4 by Abha Bhalla on or about January 28, 2010.

5   28.  Attached hereto as **Exhibit TTT** is a true and correct copy of the declaration

6 signed by Sol Virgil in or about January 2010.

7        **DEPOSITION TESTIMONY**

8   29.  Attached hereto as **Exhibit UUU** is a true and correct excerpted copy of the

9 certified transcript of the deposition of Brandon Baker taken on March 31, 2009.

10   30.  Attached hereto as **Exhibit VVV** is a true and correct excerpted copy of the

11 certified transcript of the deposition of Timothee Merri taken on November 24, 2009.

12   31.  Attached hereto as **Exhibit WWW** is a true and correct excerpted copy of the

13 certified transcript of the deposition of Renae Rodrigues taken on May 1, 2009.

14   I declare under penalty of perjury under the laws of the State of California and the United

15 States of America that the foregoing is true and correct.

16   Executed February 4, 2010 at San Diego, California

17

18        /s/Aaron A. Buckley
          AARON A. BUCKLEY

19

20

21

22

23

24

25

26

27

28

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON

BUCKLEY DECLARATION ISO KELLY'S
OPPOSITION TO MOTION FOR CLASS CERT

4

CV 08-03893 CW

### INDEX TO BUCKLEY DECLARATION

| | Document | Page Nos. |
|---|---|---|
| Ex. TT | Richard A. Parker, Ph.D declaration | 920-960 |
| Ex. UU | Sandra Ramirez declaration | 961-965 |
| Ex. VV | Janie Mann declaration | 966-970 |
| Ex. WW | Jennifer Tost declaration | 971-975 |
| Ex. XX | Jolanta Buschini declaration | 976-980 |
| Ex. YY | Monique LeClair declaration | 981-984 |
| Ex. ZZ | Nicholaus Fridblom declaration | 985-987 |
| Ex. AAA | Ryan Klein declaration | 988-994 |
| Ex. BBB | Renee Nations declaration | 995-998 |
| Ex. CCC | Stephanie Harris declaration | 999-1002 |
| Ex. DDD | Susana Jimenez declaration | 1003-1006 |
| Ex. EEE | Dionne Stokes declaration | 1007-1009 |
| Ex. FFF | Ninon Lazaro declaration | 1010-1012 |
| Ex. GGG | Bree Saltsman declaration | 1013-1017 |
| Ex. HHH | Cathy Wells declaration | 1018-1022 |
| Ex. III | Amanda Boruff declaration | 1023-1028 |
| Ex. JJJ | Mary Leatherman declaration | 1029-1033 |
| Ex. KKK | Patricia Santos declaration | 1034-1038 |
| Ex. LLL | Michelle Burns declaration | 1039-1043 |
| Ex. MMM | Thea Arnone declaration | 1044-1048 |
| Ex. NNN | Alan Wilhite declaration | 1049-1052 |
| Ex. OOO | Monty Dun declaration | 1053-1055 |
| Ex. PPP | Rosalle Noguera declaration | 1056-1059 |
| Ex. QQQ | Arnold Facundo declaration | 1060-1064 |
| Ex. RRR | Janine Aikin declaration | 1065-1068 |
| Ex. SSS | Abha Bhalla declaration | 1069-1072 |

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON

BUCKLEY DECLARATION ISO KELLY'S
OPPOSITION TO MOTION FOR CLASS CERT

5

CV 08-03893 CW

| | | |
|---|---|---|
| Ex. TTT | Sol Virgil declaration | 1073-1076 |
| Ex. UUU | Brandon Baker, deposition transcript excerpts | 1077-1081 |
| Ex. VVV | Timothee Merri, deposition transcript excerpts | 1082-1093 |
| Ex. WWW | Renae Rodrigues, deposition transcript excerpts | 1094-1100 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON

BUCKLEY DECLARATION ISO KELLY'S
OPPOSITION TO MOTION FOR CLASS CERT

6

CV 08-03893 CW

# EXHIBIT TT

Exhibit TT
920

1    E. JOSEPH CONNAUGHTON (SBN 166765)
     jconnaughton@paulplevin.com
2    AARON A. BUCKLEY (SBN 202081)
     abuckley@paulplevin.com
3    DOUGLAS R. CLIFFORD (SBN 231971)
     dclifford@paulplevin.com
4    **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP
     401 B Street, Tenth Floor
5    San Diego, California  92101-4232
     Telephone: 619-237-5200
6    Facsimile: 619-615-0700

7    Attorneys for Defendant KELLY SERVICES, INC.

8                    UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10

| CATHERINE SULLIVAN, on behalf of herself and all others similarly situated, | CASE NO. CV 08-03893 CW<br>Related to Case No. CV 07-02784 CW |
|---|---|
| Plaintiff, | **CLASS ACTION** |
| v. | **DECLARATION OF RICHARD A. PARKER, Ph.D.** |
| KELLY SERVICES, INC.; and DOES 1 through 10, inclusive, | |
| Defendants. | Hearing Date:  No hearing required<br>Courtroom:  2<br>District Judge:  Hon. Claudia Wilken<br>Trial Date:  Not set |

18        I, Richard A. Parker, hereby declare and state as follows:

19        1.       I am President of Rea & Parker Research in San Diego, California and

20   am a Professor of Practice in the School of Public Affairs at San Diego State

21   University in San Diego, California.   I have been retained by the Defendant Kelly

22   Services, Inc. to analyze statistical and sample survey issues in Catherine Sullivan

23   v. Kelly Services, Inc.  My analyses, opinions, and conclusions are based solely

24   upon work performed by me through the date of this report and upon material

25   supplied to me by Paul, Plevin, Sullivan & Connaughton, LLP, including

26   Plaintiff's Motion for Class Certification, filed January 14, 2010.  These analyses,

27   opinions, and conclusions are subject to modification should additional relevant

28   information become available that bears on these analyses, opinions, or

1    conclusions contained herein.  My *curriculum vitae* is attached hereto.

2        2.    I have published journal articles and written a textbook in use since

3    1992 about survey research (Designing and Conducting Survey Research: A

4    Comprehensive Guide with Louis M. Rea—currently in its Third Edition (2005),

5    published by Jossey-Bass).  I teach courses at the graduate and undergraduate level

6    (in statistics, public finance, economics, land use, contemporary urban issues, and

7    public policy, among others) at San Diego State University.  I have taught at San

8    Diego State University since 1985 and have been awarded multiple Teacher of the

9    Year awards, the last as recently as 2008.

10        3.    My consulting practice has two divisions—1) Survey and Focus

11    Group Market Research and 2) Economic, Development and Public Finance.

12    Among my survey research clients are the following:

13    • State of California--Senate Rules Committee

14    • State of California--Senate Special Committee on Border Issues

15    • State of California--Office of the Auditor General

16    • State of California--Office of the Attorney General

17    • Los Angeles County Metropolitan Transportation Authority

18    • Southern California Regional Rail Authority (Metrolink)

19    • Orange County Transportation Authority

20    • California Department of Transportation (CALTRANS)

21    • Bay Area Rapid Transit

22    • Metropolitan Transit System (San Diego)

23    • Southern California Association of Governments

24    • San Diego Association of Governments

25    • San Diego Gas & Electric

26    • San Diego County Sheriffs Department

27    • San Diego County Water Authority

28    • Imperial Irrigation District

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DECLARATION OF RICHARD PARKER, Ph.D.                2                CV 08-03893 CW

EXHIBIT TT
922

1. • Otay Water District
2. • University of California-Berkeley
3. • University of California-Los Angeles
4. • University of California-Davis
5. • County of Orange
6. • County of San Diego
7. • County of Imperial
8. • City of San Diego
9. • City of San Diego Housing Commission
10. • City of Escondido
11. • City of Carlsbad
12. • City of Poway
13. • City of Davis
14. • City of St. Helena
15. • City of Dana Point
16. • City of Oceanside
17. • Imperial Valley Association of Governments
18. • Imperial Valley Transit
19. • Santa Clarita Transit
20. • Santa Monica Municipal Bus Lines
21. • Culver CityBus
22. • Foothill Transit
23. • El Monte Transit
24. • Torrance Transit
25. • Cerritos on Wheels
26. • Commerce Transit
27. • Los Angeles Commuter Express
28. • Pasadena ARTS

1     •    Carson Circuit

2     •    Alhambra Transit

3     •    Riverside Transit Agency

4     •    San Diego County Department of Planning and Land Use

5     •    San Diego County Law Library

6     •    City Heights Community Development Corporation (City of San

7          Diego)

8     •    Centre City Development Corporation (City of San Diego)

9     •    North Park Main Street Association (San Diego)

10    •    San Luis Rey Indian Water Authority

11    •    California Center for Sustainable Energy

12    4.     I have testified as an expert, been deposed in that same context, and

13 submitted expert declarations about survey research in cases and courts in San

14 Francisco and Alameda County.  I attended the University of California at Berkeley

15 and received two of my degrees from that University (M.B.A. and B.S.), and have

16 consulted for clients in northern California, including

17    •    State of California--Senate Rules Committee

18    •    State of California--Senate Special Committee on Border Issues

19    •    State of California--Office of the Auditor General

20    •    State of California--Office of the Attorney General

21    •    California Department of Transportation (CALTRANS)

22    •    Bay Area Rapid Transit

23    •    University of California-Berkeley

24    •    University of California-Davis

25    •    City of Davis

26    •    City of St. Helena

27    5.     It is my understanding that, in the above-referenced matter, Catherine

28 Sullivan (Plaintiff) has filed an action against Kelly Services, Inc. (Kelly) alleging

1   that she is owed additional compensation for time and expenses related to

2   interviews that she had undertaken with customers of Kelly Services.  Of

3   immediate issue is Plaintiff's Motion for Class Certification, filed January 14,

4   2010.  The question that I have been tasked with is to opine on whether or not the

5   methodology proposed in that Motion that is intended to determine if an

6   identifiable class exists is sufficiently objective, robust, and free of non-response

7   and self-interest (moral hazard) bias to be statistically reliable.

8       6.    Plaintiff has proposed the following as the method that would be

9   implemented in order to define the class: "Temporary employees can be easily

10  notified through a post-certification mailing that they are potential class members.

11  Through a short questionnaire, each temporary employee can report whether they

12  attended at least one interview with a Kelly customer during the class period,

13  thereby identifying themselves as class members or not." (Motion for Class

14  Certification, page 15, lines 2-5)

15      7.    Plaintiff's Motion for Class Certification has drawn an inappropriate

16  arithmetic conclusion about the potential class size that likely causes the projected

17  size of the class to be overstated.  Page 7 of the Motion asserts:

18          Kelly, however, has estimated that approximately 50% of
19          Kelly customers required interviews prior to offers of
            assignment. Ex. D at 49; Ex. B at 27-28; see also, Ex. R
            at 241-242, 245-246; Ex. RR at 893 (SOF ¶ 8). Based on
20          the information available, it is reasonable to estimate that
            approximately 50% of Kelly temporary employees in
21          California during the proposed class period, or 75,000
            employees, attended at least one interview during the
22          proposed class period.

23  Apparently believing that this is merits repeating, pages 15-16 of the Motion

24  again state the assertion of 75,000 proposed class members with the following

25  statement:

26          There is evidence that approximately 50% of Kelly's
            customers required interviews with Kelly temporary
27          employees prior to offering an assignment. Ex. D at 49;
            Ex. B at 27-28; see also, Ex. R at 241-242, 245-246; Ex.
28          RR at 893 (SOF ¶ 8). Kelly has employed approximately

1    150,000 temporary employees in California during the
     proposed class period. Ex. RR at 891 (SOF at ¶ 3). Based
2    on the information available, it is reasonable to estimate
     that at least 50% of Kelly temporary employees in
3    California during the proposed class period, or
     approximately 75,000 individuals, went on at least one
4    interview on behalf of Kelly with a Kelly customer. Thus,
     the proposed class is too numerous to make joinder
5    practicable.

6       8.    The error in the above citations is potentially significant.  The

7    assertion that, with approximately 50 percent of Kelly's customers requiring

8    interviews, 50 percent of Kelly's employees during the proposed class period

9    (75,000) can be reasonably estimated to have been interviewed at least once is a

10   logical and arithmetic inaccuracy on its face, without further proof.  There does not

11   necessarily exist a direct correlation between the percentage of customers who

12   require interviews and the percentage of employees who attend such interviews.

13   There are a number of factors that refute the logic of that conclusion.  In theory, the

14   interviewing companies may be quite small and have not offered many jobs during

15   the class period in contrast to other firms who may not have interviewed but

16   offered many jobs or the customers who interview may interview for some

17   positions and not others.  Or customers may interview sometimes but not every

18   time.  It may only be certain types of jobs that require interviews, thereby

19   narrowing the range of employees who would be eligible or appropriate for

20   interview.  The point here is that if one-half of Kelly's customers conducted

21   interviews some of the time, that does not necessarily imply that one-half of

22   Kelly's employees were interviewed.

23      9.    Further, there is another logical error contained in this assertion that

24   75,000 employees have likely been interviewed at least once during the proposed

25   class period and are to be included as class members.  The proposed class

26   definition on pages 13-14 of the Motion states the following:

27       Incorporating the definitions of "temporary employee"
         and "customer" described in footnotes two and three,
28       Plaintiff seeks certification of the following class:

> All individuals who were or are employed by Kelly Services, Inc. as a temporary employee within the State of California at any time between August 14, 2004 and the date the trial commences in this action, and who attended at least one interview with a Kelly customer.

Footnote 3 that is referenced in the above selection from the Plaintiff's Motion for Class Certification is found on page 1 of the Motion and states that "Unless otherwise specified, "temporary worker" or "temporary employee" refers to persons who worked at least one day on an assignment with a Kelly customer within Kelly's commercial or non-commercial divisions." To be classified as an employee, therefore, a worker must have already worked for Kelly for at least one day. In consequence, any person interviewed but not having ever worked for Kelly prior to that interview would be wrongfully included in the proposed class. Such a person is really a job applicant—not an existing employee.

10.    These logical and arithmetic errors make it all the more vital that the methodology employed in this case be as statistically sound as possible. Yet, my fundamental opinion with regard to the Plaintiff's proposed methodology is that the methodology will fail to be a reliable and objective determinant of the class. Various incurable biases will cause this determination to fall far below any reasonable standard for validity, thereby resulting in an inability on the part of any researcher to reliably accept the proposed ascertainment of the class. I base this conclusion upon the following findings.

a.    Because of self-interest bias, respondents will not have provided information that can be relied upon by an objective fact-finder, and there does not exist any possible means to quantify the magnitude of this bias.

b.    The key question to be posed to the temporary workers in the suggested "short questionnaire" is flawed and unreliable. That question is "whether they attended at least one interview with a Kelly customer during the class period..." This question is ambiguous and will lead to responses

1  upon which reasonable reliance is not possible.  Further, by itself, this single

2  question does not address the variables indicated in paragraphs 8 and 9 herein

3  and will not obtain the necessary information to make the requisite

4  determination of class membership.

5      c.    Because of non-response bias, respondents will not have

6  provided information that can be relied upon by an objective fact-finder, and

7  there does not exist any possible means to quantify the magnitude of this

8  bias.

9      d.    The sample of proposed class members that would be derived

10  from this methodology will not be sufficiently random and cannot be

11  accepted as representative of the class.

12   11.    There are three major sources of error in any survey: (1) sampling

13  variability, generally called sampling error, which depends on sample size and

14  design (margin of error and confidence level); (2) sample biases, which are a

15  function of how well the study design is executed; and (3) response effects, which

16  are the differences between reported and "true" measures of behavior,

17  characteristics, or attitudes.  It is the second and third error—study design and

18  response effects—that this declaration addresses.

19   12.    Because of certain vagaries in the Plaintiff's Motion for Class

20  Certification, my analysis must proceed along two distinct, hypothetical tracks.

21  Inasmuch as Plaintiff has not indicated the manner in which the data that is to be

22  obtained will be used, I am inferring that one of two methodologies will be

23  applied—neither of which will be satisfactory as an objective measure.

24      a.    The first methodology that I am inferring that the Plaintiff might

25  employ is that the Plaintiff will send the short questionnaire to 150,000

26  (approximate) temporary Kelly Services workers who were employed during

27  the class period (beginning August 2004).  The question was raised in

28  paragraphs 7-9 above about the logical flaws of the 150,000 estimate, but it is

1    used as an example only for purposes of this inferred methodology.   This

2    method would then include in the proposed class those respondents who

3    reply to the short questionnaire that they did participate in at least one

4    interview with a "Kelly customer" during the class period along with any

5    other questions that might be necessary to establish class membership.  In

6    this manner, for example, if a hypothetical 20,000 of the 150,000 respond and

7    15,000 of those 20,000 indicate that they did have at least one such interview

8    and satisfy other criteria discussed above in paragraphs 8-9, then the class

9    would be suggested to consist of the 15,000 members who so responded and

10   only those 15,000 respondents.  This method fails on the basis of points

11   indicated in paragraphs 10a and 10b above.

12        b.     The second methodology that I have inferred as being a possible

13   course to be followed by Plaintiff is that, inasmuch as a hypothetical 75

14   percent (15,000 out of 20,000) indicated that they had participated in such an

15   interview among other criteria that will be required, 75 percent of the

16   150,000 proposed temporary workers (112,500) will be suggested by Plaintiff

17   as the class size.  This method fails on the basis of all points above—

18   paragraphs 10a, 10b, 10c, and 10d.

19      13.    Beginning with the methodology described in paragraph 12a, the

20   proposed class members can be expected to be infected by moral hazard/self-

21   interest bias such that their responses cannot be considered to be sufficiently

22   reliable in survey form without the ability to question and cross-examine the

23   individual respondents.

24      14.    The initial risk of self-interest bias may be introduced by the letter

25   from counsel indicating that the recipient of the letter may be a class member and

26   possibly eligible for financial compensation.  Scientific sample survey research

27   demands neutrality and impartiality.  Responses that are preferred by survey

28   sponsors, to the extent that there are any, should not be evident to the survey

respondent.   Don Dillman, one of the foremost experts in self-administered questionnaires, confirms the requirement that solicitations to participate in data gathering must be as neutral as possible in order to trust the results as being representative and unbiased.

> The goal here is to design an appeal that makes it unclear which side of an issue, if any, corresponds to the sponsor's beliefs… (Dillman, Don: <u>Mail and Internet Surveys</u>, 2000, p. 161).

15.   Correspondence from counsel that will accompany the questionnaire and discuss the potential class action is not sufficiently neutral nor absent indications of the sponsor's side of the issue to be free of this undesirable influence.

16.   Self-interest bias is an easy concept to grasp—namely that responses can tend to be biased when the respondent is aware of the response that will most benefit him or her and/or be most pleasing to the survey sponsor.   This calls into question the accuracy of the responses given.   In court, issues of veracity are engaged in the examination/cross-examination process.   In scientific primary data research, responses are generally accepted as true, aggregated, tallied, and reported with a minimum, if any, of such probing.   As such, the purpose of the survey must be guarded to the maximum feasible extent, and this requirement is not well served by a letter from an attorney indicating the potential for participation in a financially beneficial legal action.

17.   The second risk of error in the first hypothetical methodology is that of recall error.   Three distinct types of recall error are involved in this proposed methodology.   These errors are as follows:

a.   <u>Recall Error Over Time</u>:  The suggested question to be asked will require that the respondent accurately recall interviews up to almost six years prior to the completion of the questionnaire.   It is an accepted survey design policy that people's ability to recall the past is limited. The more

current and specific the question reference, the better. If recall is necessary, the time frame that is generally used is as recent as possible and generally not over six months-to-one year unless the reference is to major events.

From an academic perspective, Philip Clarke (University of Oxford, UK), Denzil Fiebig (University of New South Wales, Australia) and Ulf-G Gerdtham (Lund University, Sweden) found in seeking self-reported data about the number of nights spent in a hospital during a three month period that the data was more accurate if respondents were asked about these nights for a two month period, with a third month imputed from the responses than if respondents were asked about the full three month period ("Optimal Recall Length in Survey Design", 2005).

Other academicians who acknowledge this seemingly self-evident observation include the following very prominent and highly regarded statistical survey research authors.

> The accumulation of similar events over time means that we have more difficulty remembering specific events as more time elapses.  The impact of the passage of time is probably the strongest and most robust finding to emerge from more than 100 years of research on forgetting. (Groves, Robert; Fowler, Jr. Floyd; Couper, Mick; Lepkowski, James; Singer, Eleanor; and Tourangeau, Roger.  Survey Methodology, 2004, p. 216).

b.   <u>Confusion/Ambiguity</u>:  The particular subject matter of the proposed questionnaire lends itself almost undeniably to confusion among respondents, especially when compounded by the time factor.  Many, if not most, temporary workers are enrolled with more than one agency at any given time and accept interviews and temporary positions generated by any of these agencies, as is the case with the Plaintiff (paragraph 27 of Joint Stipulation of Facts—June 15, 2009).  As such, if asked about an interview five years ago, for example, the exact agency that referred the worker may be unclear, leading to confused and inaccurate responses.

1    In seeking to verify that the interviewing employer may have been a

2    customer of Kelly Services, it is also to be noted that many businesses enroll

3    with several agencies at one time and may accept interviewees and

4    temporary workers from many temporary agencies during the same

5    employee-search time frame.  As such, the name of the interviewing

6    employer may not provide any additional, reliable information either in

7    establishing interviews arranged by Kelly Services.

8        c.    Overestimation:  There exists considerable literature that

9    respondents have a tendency to overestimate occurrences of particular events

10    when asked to recall at some time in the future.

11    Respondents are more likely to report higher levels of
      participation and nonrespondents lower levels of
12    participation as the length of recall period increases.
      Findings indicate that studies which use long recall
13    periods, or do not control nonresponse bias, overestimate
      use. (Tarrant, Michael; Manfredo, Michael; Bayley,
14    Peter; and Hess, Richard.  "Effects of Recall Bias and
      Nonresponse Bias on Self-Report Estimates of Angling
15    Participation," May, 1993, p.217).

16    ----------------------------------------------------------

17    On average, employees remember their lost jobs as
      paying $1,317 more per year than they actually did.
18    (Oyer, Paul, "Recall Bias Among Displaced Workers,"
      October, 2003, p.1)
19

20    ----------------------------------------------------------

21    There is evidence that the extent of telescoping is likely
      to be related to the salience of the events being recalled
22    and so we might expect those people who had larger
      expenditures are more likely to telescope those events
23    into the recall period and thus bias upward estimates of
      health care expenses during the reference period.
24    (RAND/UCLA/World Health Organization, Workshop on
      Health Status Measurement in Social Surveys. October,
25    1999, www.rand.org/labor/workshops/intlhlthwkshp)

26    18.    In summary regarding the first hypothetical methodology—sending

27    out the questionnaire and literally accepting the responses as a true indication of

28    the total class size, it is concluded herein that such an approach would possess a

series of incurable errors consisting of the following:

a.    There exists considerable risk of self-interest bias that, without the benefit of cross-examination, can be expected to cause some overstatement of the incidence of interviews that Kelly offered to temporary workers during the class period.  That is to say, standard aggregated statistics will not serve fact-finding well in comparison to cross-examination.

b.    Even in the absence of potential overstatement of incidence due to self-interest bias, there exists the well-established fact that memory and the ability to accurately recall information decline over time and that 6 years is a particularly long period for accurate recall to be reasonably expected or relied upon.

c.    The non-exclusive nature of the agency-temporary worker and customer-agency relationships can be expected to cause confusion and consequent inaccuracies in the responses obtained.

d.    There is a tendency for those who do respond in an intended truthful manner to such inquiries to do so in a somewhat overstated and overestimated manner nonetheless, thereby leading to data that is unreliable and is not able to be corrected or adjusted to any known degree of statistical confidence.

19.    The second hypothetical methodology (paragraph 12b) is that, instead of counting only the interviewed respondents as class members, the interviewed respondents will be utilized as a scientific sample representative of the entire 150,000 temporary workers during the class period.  Such an approach will contain all of the errors cited above and summarized in paragraph 14 and will also contain two major additional errors – non-response bias and a related lack of representativeness that renders the information obtained to be  unacceptable as a representative sample or subset of the entire population of Kelly temporary workers during the class period.  As such, data obtained through this methodology

1   cannot be expanded or imputed to apply to any individuals beyond those who

2   responded.  It is not to be considered as a representative, scientific, random sample.

3       20.    To the extent that responses are not received from 100 percent of the

4   sample, questions properly arise about using the results from the ultimate sample to

5   provide a reliable estimate of the full population of 150,000 workers. Of particular

6   concern is that response rates for blanket questionnaires such as this are generally

7   quite low, with far more non-respondents than respondents.  If the sampled cases

8   from which data are not received are different from those that responded in some

9   important way, then the estimates from the sample will be potentially biased. This

10  is called "non-response error" or "non-response bias." The smaller the ultimate

11  response rate, the more likely is the risk of non-response bias. Non-response bias is

12  the departure of the expected values of estimated statistics derived from sampling

13  from their true values owing to the absence of responses from some portion of the

14  population that differs systematically from those portions of the population that did

15  respond.

16          Unless you have very strong reasons to believe otherwise,
            you should assume that the non-respondents do not come
17          randomly from the population. (Simon, Julian, Basic
            Research Methods in Social Science, 1969, p. 119)
18

19          --------------------------------------------------------

            Some subjects who are supposed to be in the sample may
20          refuse to participate or it may not be possible to reach
            them.  This results in the problem of non-response, which
21          is a serious one for many surveys.  (Agresti, Alan and
            Finlay, Barbara: Statistical Methods for the Social
22          Sciences, 3rd edition, 1997, p. 23).

23      21.    There exists a connection between self-interest bias and non-response

24  bias.  Non-response bias is somewhat more complex than self-interest bias.  In

25  statistical primary data gathering, where people are involved in answering

26  questions, the response rate to the process will not typically be 100 percent. There

27  are almost always some members of the initial sampling frame who cannot be

28  contacted, who refuse to participate, or who, for some other reason, fail to

1    complete the data collection process.

2        22.    The citations below from various highly regarded authors and

3    publications provide an additional statement of the risks and negative

4    consequences of self-interest bias as it interacts with non-response bias.  That is,

5    questionnaire completion will be skewed toward those who perceive that their

6    interest is greatest.  This implies that those who perceive that they have more to

7    gain will be more likely to participate than those who believe that the issues do not

8    apply significantly to them.

> Of the many features of a survey request, we believe that
> the subject matter, or topic, is particularly likely to lead to
> "nonignorable" non-response, that which produces non-
> response error.  This follows from the fact that people
> more interested in the topic tend to have attributes on key
> survey variables different from those people less
> interested in the topic.  Hence statistics computed on
> variables central to the topic are apt to be among the most
> susceptible to non-response error, especially when the
> topic is made salient in the recruitment protocol.
>
> Leverage-salience theory does not simply predict that
> persons interested in the survey topic will be
> overrepresented among respondents (and
> underrepresented among non-respondents), relative to
> those uninterested.  It predicts that the degree of
> overrepresentation will be a function of the salience of
> (and attitude toward) the survey topic among those
> deciding whether to cooperate... (Groves, Robert;
> Presser, Stanley; and Dipko, S: "The Role of Topic
> Interest in Survey Participation Decisions" Public
> Opinion Quarterly (Vol 68-No 1), 2004, p. 4).
>
> ------------------------------------------------
>
> When the sample person judges that the sponsor has an
> identifiable "point of view" on the survey topic, reaction
> to that point of view by the sample persons can prompt
> them to respond or refuse (Groves, Robert and Peytcheva,
> Emilia: "The Role of Non-response Rates on Non-
> response Bias: A Meta-Analysis" Review Draft, 2006,
> p.16 -- http://www.ccsr.ac.uk/methods/
> festival/programme/snr/documents/BGTheImpactofNonre
> sponseRatesonNonresponseErrorForma.pdf).

23        23.    The lack of reliability of the data due to non-response error becomes

insurmountable when participation is sought in the manner that is indicated in the

DECLARATION OF RICHARD PARKER, Ph.D.          15          CV 08-03893 CW

**Exhibit TT
935**

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

1  Plaintiff's motion, whereby temporary workers who do not believe that they qualify

2  for any additional compensation because they do not recall attending any

3  interviews will be much less likely to respond and thereby lead to a collection of

4  respondents heavily skewed toward the responses of those who do recall being

5  interviewed during this period.

6      24.    Paragraphs 7-9 indicate that the single question suggested in the

7  Plaintiff's Motion is inadequate in its failure to obtain all of the information that is

8  necessary to make a determination of the proposed class membership and size.

9  Such information as how many interviews were attended, for which Kelly

10  customers did they interview, with which other temporary agencies was the

11  respondent enrolled during the proposed class period, what interviews were

12  conducted with customers of these other agencies, when did the respondent first

13  work for Kelly Services, among many others will be necessary.  The more detail

14  that is required from the respondent, the greater will be the non-response,

15  especially among those respondents who do not think that they are eligible for any

16  additional compensation.

17      Survey length also had a significant impact on response
    rates. Physicians who received the short questionnaire

18      (one page, one-sided survey) were significantly more
    likely to respond than physicians receiving the slightly

19      longer questionnaire (one page, two-sided survey).
    McFarlane, Emily; Olmstead, Murray; Murphy, Joe; and

20      Hill, Craig, "Nonresponse Bias in a Mail Survey of
    Physicians," p. 8. Paper presented at the 61st Annual

21      Conference of the American Association for Public
    Opinion Research (AAPOR) Montreal, Quebec, May,

22      2006

23      … the implication of most is that the increased burden [of
    survey length] causes respondents to be less likely to

24      participate.  Bogen, Karen, U.S. Bureau of the Census
    The Effect of Questionnaire Length on Response Rates:

25      A Review Of The Literature, January, 1997

26      25.    Some of these issues such as number of interviews, interviewing

27  company, or whether or not this was the first job for Kelly will be subject to

28  additional recall error probability.  Any issues required to be addressed pertaining

1  to the extent to which Kelly exerted control during the interview process will risk

2  further damage to the usefulness of the responses obtained. The greater the

3  number of such questions required to determine possible class membership--and

4  there are, quite obviously, many more than suggested in the Plaintiff's Motion--the

5  less likely will be the reliability of the determination of a commonality of

6  experience and common proof that lends itself to class action.

7      26. In order to make proper use of inferential statistical techniques

8  (generalizing findings from a sample to the general population from which the

9  sample was drawn) and have an acceptable degree of confidence in the

10  representativeness of the data obtained, the sample itself must be random both in

11  selection method and in actual participants. Random (probability) sampling entails

12  letting chance determine the selection of members of the population for the sample.

13  Thus random sampling is taking a unit from a population on a chance-determined

14  basis. Nonrandom samples cannot, at face value, be the basis for generalizing to

15  the population that the sample purports to represent. Further, even if one chooses a

16  truly random target sample, the final sample is not representative absent

17  randomness as to those who actually respond.

18      27. In the matter of the implied methodology in paragraph 12b, random

19  selection of potential respondents will not be obtained—all participants will be

20  contacted and actual participants will have been self-selected. Neither will random

21  participation likely result—participants will have volunteered in response to the

22  letter and questionnaire. The sample ultimately obtained is known as a convenience

23  sample (using respondents not selected randomly but instead based upon their ease

24  of accessibility) or a haphazard sample (using whatever responses are obtained

25  while undertaking no effort to obtain fully representative responses from a random

26  sample). Haphazard and convenience samples cannot be relied upon as being

27  representative of the population they purport to represent, as indicated by the

28  citations below.

1

2

3

4

5

> Any poll in which respondents were able to select
> themselves, including call-in polls, and Internet or Web
> surveys where people volunteer to participate, are non-
> probability samples, and thus have no basis in science. It
> is probably a disservice to the public to report the results
> of such pseudo-surveys (Zukin, Cliff: "Sources of
> Variation in Published Election Polling: A Primer", 2004
> p. 2).

6

---------------------------------------------------------

7

8

9

10

> Haphazard sampling can produce ineffective, highly
> unrepresentative samples and is not recommended. When
> a researcher haphazardly selects cases that are
> convenient, he or she an easily get a sample that seriously
> misrepresents the population. Such samples are cheap
> and quick; however, the systematic errors that easily
> occur make them worse than no sample at all. (Neuman,
> W. Lawrence, Basics of Social Research, 2004 p. 137)

11    28.    In this case, in which individuals are told that they are part of a

12  plaintiff class seeking money, those responding to the call to provide data will most

13  likely be those who feel that they have the most to gain such that, even if true

14  responses were obtained from them, these responses cannot be assumed to be

15  representative of the entire population.  This is especially the case the more

16  demanding the survey instrument, which Plaintiff has seriously understated.  Such

17  a disproportionate incentive to participate causes a non-ignorable and significant

18  potential for non-response bias.

19    29.    In conclusion, whatever the ultimate information obtained in the

20  manner proposed in Plaintiff's motion (see paragraphs 12a and 12b),

21    a.    A substantial risk of self-interest bias demands individual

22  respondent cross-examination in the context of litigation in order to ascertain

23  the accuracy and veracity of the information obtained,

24    b.    Memory recall effects over so long a period of time (including

25  the tendency in such situations for overestimation) and the non-exclusive

26  character of the temporary worker industry further call into question any

27  ability to obtain reliable and sufficiently complete information that lends

28  itself to common proof, and

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DECLARATION OF RICHARD PARKER, Ph.D.                    18            **Exhibit TT
                                                                      938**            CV 08-03893 CW

1        c.     Non-response bias will render the information obtained from

2     those who do respond through this questionnaire process to be absent

3     adequate randomness, to be unreliable and to not be useable as

4     representative of the population.

5     30.    There is no provision possible in the methodology as it is proposed

6 that will provide an acceptable and determinable degree of statistical reliability that

7 the information obtained will be adequately informative, accurate and

8 representative of the general class of Kelly temporary workers during the

9 designated class period.

10    I declare under the penalties of perjury under the laws of the State of

11 California that the foregoing is true and correct.  Executed on Feb 2

12 2010 at San Diego, California.

13

14

RICHARD A. PARKER, Ph.D.

# Richard A. Parker, Ph.D.
## Curriculum Vitae

**Education**

Ph.D.          Pacific Western University (Los Angeles, California)
               Doctor of Philosophy (Business Administration)
               Also attended University of California-Los Angeles

M.B.A.         University of California, Berkeley (Berkeley, California)
               Master of Business Administration
               Teacher Certification — Lifetime Secondary Credential
               (Business, Social Studies, English)

M.C.P.         San Diego State University (San Diego, California)
               Master of City Planning

B.S.           University of California, Berkeley (Berkeley, California)
               Bachelor of Science — Business Administration
               (Phi Beta Kappa)
               Also attended Brown University (Providence, Rhode Island)


**Selected Related Professional Experience**

1985-          <u>Professor of Practice</u>, School of Public Affairs, San Diego State University, San Diego,
               California.  Courses taught:
- Seminar in Urban Planning Methodologies (graduate)
- Issues in Financing Urban Development (graduate)
- Quantitative Methods (Statistics) (graduate)
- Seminar in Quantitative Approaches to Public Administration (graduate)
- Quantitative Techniques in Urban Planning (graduate)
- Methods of Analysis in City Planning (upper division undergraduate)
- Contemporary Urban Issues (upper division undergraduate)
- Public Policy (graduate and upper division undergraduate)
- Public Finance (graduate and upper division undergraduate)
- Seminar in Economics of Urban and Regional Planning (graduate)
- Metropolitan Area (upper undergraduate & graduate)
- International Finance (graduate)

1982-          <u>President/Project Director</u>, Rea & Parker Research

Research Clients include:
- State of California--Senate Rules Committee
- State of California--Senate Special Committee on Border Issues
- State of California--Office of the Auditor General
- State of California--Office of the Attorney General
- California Department of Transportation (CALTRANS)
- San Diego County Sheriffs Department
- San Diego County Water Authority
- Imperial Irrigation District
- Otay Water District
- San Diego Gas & Electric
- County of San Diego
- County of Orange
- City of San Diego
- City of San Diego Housing Commission

**Exhibit TT**
**940**

- City of Escondido
- City of Carlsbad
- City of Oceanside
- City of Poway
- City of Davis
- City of St. Helena
- City of Dana Point
- City of Holtville
- Los Angeles County Metropolitan Transportation Authority
- Southern California Regional Rail Authority (Metrolink)
- Orange County Transportation Authority
- Bay Area Rapid Transit
- San Diego Metropolitan Transit System
- Riverside Transit Agency
- Imperial Valley Transit
- Southern California Association of Governments
- Imperial Valley Association of Governments
- San Diego Association of Governments
- Santa Clarita Transit
- Sweetwater Authority
- San Diego County Taxpayers Association
- San Diego County Law Library
- California Center for Sustainable Energy
- City Heights Community Development Corporation (City of San Diego)
- Centre City Development Corporation (City of San Diego)
- North Park Main Street Association (San Diego)
- San Luis Rey Indian Water Authority
- La Jolla Band of Mission Indians
- Viejas Enterprises
- Foxwoods Development
- Wallace, Roberts and Todd--Planners and Architects (San Francisco)
- Westec Services, Inc. (Salt Lake City)
- Joint Labor/Management Committee-Retail Food Industry
- San Diego/Imperial Counties Labor Council  AFL-CIO
- PRC Engineering
- RECON, Incorporated
- Christiansen and Wallace
- Stevens Planning Group
- IBI Group
- Brian Mooney and Associates--Urban Planners
- MNA Consulting Services
- Stoorza, Ziegaus, & Metzger--Public Relations
- Southwest Strategies, LLC
- Stirling Enterprises
- Pardee Construction Company
- San Diego Aircraft Carrier Museum Foundation
- Westbrook Development
- Genstar Development
- Laing Urban
- Pacific Century Development
- Subway, Inc.

**Exhibit TT**
**941**

- Westfield Shopping Centers
- Shea Properties
- Pacific Beachfront Resort
- Housing Solutions Alliance
- Smart Growth Coalition—National City
- Seyfarth Shaw LLP—Attorneys at Law
- Paul, Plevin, Sullivan & Connaughton LLP
- Ault, Deuprey, Jones, Danielsen, & Gorman--Attorneys at Law
- Higgs, Fletcher & Mack--Attorneys at Law
- O'Neill, Huxtable & Abelson--Attorneys at Law

## Selected Publications

### Books

Designing and Conducting Survey Research: A Comprehensive Guide (with Louis M. Rea, Ph.D., 1992 (2nd edition 1997—3rd edition 2005). Jossey-Bass, Inc., Publishers, San Francisco.

### Monographs/Research Reports

Cost Benefit Analysis: A Case Study of the Berkeley Park Marina Shopping Center, University of California, Berkeley, California, 1971, 168 pp.

The Economics of Environmental Restrictions on the Use of Urban Land, Institute of Urban and Regional Development, University of California, Berkeley, California (with Leonard Merewitz, Ph.D.), 1973, 79 pp.

Back to the City: The Middle Income Housing Market in Centre City San Diego, San Diego State University, San Diego California, 1984, 258 pp.

The Fiscal Impact of Undocumented Immigrants Residing in San Diego County, State of California, Office of the Auditor General, 1992, 129 pp.

Illegal Immigration in San Diego County: An Analysis of Costs and Revenues, State of California, State Senate Office of Reproductions, 1993, 172 pp.

### Articles

"Water Supply for Urban Southern California: An Historical and Legal Perspective," Glendale University Law Review, Vol. 8, Nos. 1-2, 1988.

"The Retail Commercial Strip in Transition: A Case Study in San Diego," The Western Governmental Researcher (with Louis M. Rea, Ph.D.), Fall, 1989.

## Selected Public Testimony/Formal Speeches

"Fiscal and Economic Impact of Multiple Species Conservation Program." Speech delivered at San Diego Association of Governments Board of Directors meeting, September, 1995.

Panelist, "Criminal Justice Impact of Undocumented Immigration," at Criminal Justice Research Association, San Diego, California, October 15, 1993.

**Exhibit TT
942**

"Undocumented Immigrants in San Diego County." Testimony before California State Senate Special Committee on Border Issues, Sacramento, California, August 5, 1992.

"Undocumented Immigrants in San Diego County." Testimony before California State Joint Legislative Audit Committee, Sacramento, California, August 11, 1992.

"Undocumented Immigrants in San Diego County." Testimony before California State Assembly, Sacramento, California, October, 1992.

Panelist, "San Diego Clean Water Summit," July, 2005

## Expert Witness: Survey Research and Statistical Analysis

### Seyfarth Shaw

- Analyzed and testified as expert witness (court once—deposition once) regarding adequacy of statistical survey sampling of and statistical conclusions drawn from employees in 4 class action lawsuits

### Higgs, Fletcher & Mack

- Analyzed and testified (deposition) as expert witness regarding statistical survey concerning appraisal of commercial real estate subject to condemnation.

### Paul, Plevin, Sullivan & Connaughton

- Contracted as expert witness regarding adequacy of statistical survey sampling of and statistical conclusions drawn from employees—settled prior to any testimony

## Specific Survey Research Consultative Projects

### San Diego County Water Authority Public Opinion Surveys

Prepared, implemented, and analyzed 2003, 2004, and 2005, 2006,2008 and 2009 Public Awareness Survey of telephone respondents (600 in 2003, 710 in 2004, 725 in 2005, and 700 in 2006, 2008 and 2009) concerning behavior, opinion, rate tolerance, future needs assessment issues, desalination, water reclamation, conservation practices.

Also for the **San Diego County Water Authority**:

- Prepared, implemented, and analyzed survey of General Managers and Department Heads of 23 member agencies about satisfaction, effectiveness, usefulness of services and programs provided by Water Authority in 2003 and 2005

- Prepared, implemented, and analyzed employee satisfaction survey of Engineering Department.

**Exhibit TT**
**943**

- Prepared, implemented, and analyzed 400 respondent survey among San Diego County contractors regarding project labor agreements and public works contracting.

- 2008—two 600 person telephone surveys tracking before and after impacts of public awareness campaign concerning water conservation.

**Los Angeles County Metropolitan Transportation Authority:**

**On-Board and Telephone Bus Survey**

Conducted the 2002 On-Board Bus Survey for **Los Angeles County Metropolitan Transportation Authority**, including 40,000 rider/on-board surveys, 2,500 follow-up telephone interviews, and 10 focus groups.

Final deliverables include/included 4 reports:

1) Satisfaction, travel patterns, fare media, and demographics of 31,000 weekday bus riders on LACMTA buses and those of 12 municipal transit operators within Los Angeles County (**Alhambra Community Transit, Culver City Bus Lines, Commerce Transit, Pasadena ARTS, Cerritos-On-Wheels (COW), Santa Monica Big Blue Bus, Los Angeles Commuter Express, Santa Clarita Transit, Torrance Transit, Carson Circuit, El Monte Trolley,** and **Foothill Transit).**

2) Satisfaction, travel patterns, fare media, and demographics of 3,500 weekend bus riders on LACMTA buses.

3) Detailed follow-up telephone survey of 2,500 weekday riders of MTA and 12 municipal operators expanding upon demographics, satisfaction, problem occurrence, importance/concern, travel behavior, use of MTA website, customer service, and marketing media and messages.

4) Geocoded home, origin (production), boarding, alighting, and destination (attraction) data is presented in color graphics by line, service sector, and planning area.

Prepared the on-board survey instrument for LACMTA and each of the 12 municipal operators and had its surveyors ride the buses of randomly selected bus runs from June, 2001 to December, 2001, with follow-up surveys also conducted on-board during March, 2002.

Prepared and tested the survey instrument in 10 focus group sessions conducted in Los Angeles County and in two extensive on-board pretests involving almost 1,000 respondents. Focus groups were conducted in different geographical areas of the County, among different age and ethnic groups, and in both Spanish and English.

The telephone survey consisted of 39 questions, including 110 individual variables. The mean survey time was 13.09 minutes, administered in both English and Spanish. Media information concerning messages communicated on television was added to more typical transportation-based questions. It was conducted from late January to early March, 2002. The analysis consisted of detailed crosstabulations, correlations, and analyses of variance in order to assess market segmentation strategies.

**Exhibit TT**
**944**

v

## On-Board and Telephone Rail Survey

Conducted the 2002 On-Board Rail Survey for **Los Angeles County Metropolitan Transportation Authority**, including 15,000 rider/on-board surveys, 1,000 follow-up telephone interviews, and 3 focus groups.

Final deliverables include/included 4 reports:

1) Satisfaction, travel patterns, fare media, and demographics of 12,000 weekday riders on LACMTA Metro Rail—Blue, Green, and Red Lines.

2) Satisfaction, travel patterns, fare media, and demographics of 3,000 weekend bus riders on LACMTA Metro Rail—Blue, Green, and Red Lines.

3) Detailed follow-up telephone survey of 1,000 weekday and weekend riders of Metro Rail expanding upon demographics, satisfaction, problem occurrence, importance/concern, travel behavior, use of MTA website, customer service, and marketing media and messages.

4) Geocoded home, origin (production), and destination (attraction) data is presented in color graphics by line.

Prepared the on-board survey instrument for LACMTA and had its surveyors ride the trains on randomly selected runs from August, 2001 to October, 2001, with follow-up surveys also conducted on-board during February, 2002.

Prepared and tested the survey instrument in 3 focus group sessions conducted in Los Angeles County and in two extensive on-board pretests involving almost 500 respondents. Focus groups were conducted in different geographical areas of the County, among different age and ethnic groups, and in both Spanish and English.

The telephone survey consisted of 42 questions, including 103 individual variables. The mean survey time was 12.29 minutes, administered in both English and Spanish. It was conducted from late January to early March, 2002. Media information concerning messages communicated on television was added to more typical transportation-based questions. The analysis consisted of detailed crosstabulations, correlations, and analyses of variance in order to assess market segmentation strategies.

## Orange County Transportation Authority (OCTA):

## Market Program Consultant—Seniors, Pre-Seniors, and Hispanics

Marketing program consultant in OCTA's effort to attract and retain more riders, particularly from Hispanic and senior citizen groups. Sixteen focus groups were scheduled and twelve conducted (four having been deferred at OCTA's request to July, 2002).

Focus groups were held among riders and non-riders in Hispanic and senior citizen population enclaves. Further focus groups were held among pre-seniors (age 55-64) in order to ascertain

**Exhibit TT
945**

information about their willingness to ride the buses as they grow older and what they would require in order to do so with much satisfaction.

Marketing messages were tested, including a new logo, new bus schedules, and OCTA publications. Intensive examination of media usage, including radio stations preferred, television Channels watched, and newspapers read, was undertaken. Advertisements that are successful among these groups were explored.

Also conducted were two 600-person telephone surveys among Latino and senior residents of Orange County. These surveys pursued much the same information as the focus groups, including media usage, television programs watched, community cable programming information, and so forth in a quantitative mode that permits tracking and trend analysis over time. Detailed analysis using crosstabulations, analyses of variance, correlations, and regression, and factor analysis were undertaken as a part of the segmentation effort.

## CenterLine Customer Profile

Conducted the CenterLine Customer Profile for the **Orange County Transportation Authority** involving intercept surveys of 8,800 potential urban light rail users, 1,500 telephone survey interviews, and 12 focus group/roundtables. Final analysis assessed likely ridership, preferred destinations, trip purposes, public support, demographic and psychographic profiles of potential light rail ridership

Twenty-one sites were selected in Orange County that were to be likely destinations for a proposed light rail system. Randomly selected individuals at sites including Disneyland, John Wayne Airport, University of California-Irvine, California State University-Fullerton, Main Street Santa Ana, Civic Center, UCI Medical Center, South Coast Plaza, and others were surveyed in person to determine their interest in using the proposed light rail system, their current transportation behavior, and design/marketing themes. This intercept survey was a short 4-minute interview to determine how far people would walk, how often they would ride, for what purpose (employment/recreation), among others.

These intercept interviews were followed-up by detailed 18-minute telephone interviews of randomly selected residents of central Orange County and western Riverside and San Bernardino Counties. These surveys were to establish greater depth of understanding of the potential market, including demographics and transportation needs/desires. Detailed analysis using crosstabulations, analyses of variance, correlations, and regression, and factor analysis were undertaken as a part of the segmentation effort.

At the same time as the surveys were being conducted, 12 focus groups throughout the County (Fullerton, Santa Ana, Costa Mesa, Irvine, Orange, and Anaheim) involving mayors, city council persons, business leaders, local merchants, tourism officials, and the general public were being held to uncover the qualitative richness behind the quantitative intercept and telephone survey data pertaining to public perceptions of the system, public fears of disruption, desired routes, and local needs.

Additional research projects for the **Orange County Transportation Authority**

  - Prepared, conducted and analyzed 2,000 person rider/on-board bus survey for the **Orange County Transportation Authority** regarding monthly, weekly, and

**Exhibit TT**
**946**

daily bus pass sales. Prepared questionnaire, administered survey, analyzed data in order to assess potential for expanding bus pass sales.

- Prepared <u>Multi-Cultural Market Assessment Study</u> for transportation services in Orange County. Formulated baseline data and marketing strategies for long- and short-term transportation related issues facing Orange County's diverse multi-cultural communities, with particular emphasis upon Hispanic and Vietnamese communities. Administered three different statistical surveys including intercept and rider/on-board formats, each in English, Spanish, and Vietnamese.

- Prepared, conducted and analyzed Vietnamese ridership study, including in-person intercept survey, telephone sample survey, and focus group among Vietnamese community leaders regarding current bus service and future transit needs in the Vietnamese areas of Orange County.

- 2007--Analyzed 2,000 person ACCESS (disabled paratransit) customer service satisfaction survey.

- 2007—conducted and analyzed counts of passengers on Amtrak and Metrolink trains at every Orange County station plus Oceanside, Norwalk, and Commerce.

- 2008—Focus groups (4) concerning integration and improvements to service (Metrolink, Amtrak, Coaster) along Los Angeles-San Diego (LOSSAN South ) corridor

- 2008/2009—Rail safety study including observations at each of 54 at-grade rail crossings in Orange County, interviews with 60 local decision makers and other community leaders, and 600 person residential telephonic survey.

- Prepared <u>Multi-Cultural Market Assessment Study</u> for transportation services in Orange County. Formulated baseline data and marketing strategies for long- and short-term transportation related issues facing Orange County's diverse multi-cultural communities, with particular emphasis upon Hispanic and Vietnamese communities. Administered three different statistical surveys including intercept and rider/on-board formats, each in English, Spanish, and Vietnamese.

- Conducted Vietnamese ridership study, including in-person intercept survey, telephone sample survey, and focus group among Vietnamese community leaders regarding current bus service and future transit needs in the Vietnamese areas of Orange County.

- Conducted focus groups among senior/disabled bus riders and full fare bus riders concerning proposed restructuring of bus fares. Also conducted roundtable meetings with coach operators and social service agency representatives.

- Conducted public participation portion of Orange County Bus Improvement Project (BUSLINK). Prepared report based upon focus group discussions with bus users and non-users, employee transportation coordinators, real estate developers, senior citizens, students, transportation advocates, Orange County employers, and members of ethnic minority communities throughout the County.

**Exhibit TT**
**947**

Final report summarized the perceptions of focus group participants concerning potential improvements to the bus system.

- Conducted focus group discussions with Metrolink commuter rail users and non-users within Orange County for purposes of identifying service and marketing issues and opportunities. Prepared final report summarizing findings from these focus group discussions.

- Conducted focus group discussions with clients of ACCESS paratransit service for purposes of identifying the viability of alternative transportation options.

- Conducted focus groups among users of ACCESS for purposes of refining six strategies for providing a financially viable service to ACCESS customers and prepared formal final report.

- Conducted a series of roundtable discussions concerning the implementation of changes in the ACCESS system pertaining to reservations, eligibility, schedule, rates, pick-up and delivery policy, etc., and prepared formal final report.

- Conducted focus group discussions concerning Master Plan of Countywide Commuter Bikeways and prepared final report.

- Prepared <u>Multi-Cultural Market Assessment</u> update, including focus groups within the Hispanic community concerning the marketing of transportation services. Evaluated the success of programs commenced following the initial Multi-Cultural Market Assessment.

- Conducted focus group and roundtable discussions with community leaders, general public, and representatives of goods movement/freight industry regarding long-range transportation planning in Orange County.

- Conducted focus groups among businesses and residents of Orange County concerning recommended Corridor (Fullerton-Irvine) Transportation Strategy.

- Conducted focus groups among residents of northern, central, and southern Orange County regarding the FastForward long-range transportation.

- Conducted roundtables and focus groups concerning routing issues and public support for the CenterLine urban light rail system proposed for Orange County.

- Conducted Vietnamese ridership study, including focus groups among Vietnamese community leaders regarding current bus service and future transit needs in the Vietnamese areas of Orange County.

**State of California (Senate Rules Committee, Senate Select Committee on Border Issues, and Office of the Auditor General)**

- Analysis of fiscal impact of undocumented immigrants on public services in San Diego County and California, including criminal justice system, education, and public health. Further identified estimated number of undocumented residents

**Exhibit TT**
**948**

and their contributions to State and local tax revenues.  Also included in the analysis were federal revenues, false documentation issues, and macro economic impacts.  Study included substantial primary data gathering techniques, including direct interviews with undocumented immigrant workers and INS returnees. Prepared, administered, and analyzed sample surveys of undocumented immigrants in San Diego County for purposes of determining employment characteristics, revenue generation, demographics, and migration patterns. Research included extensive face-to-face interviews and structured roundtable discussions.

**City of Oceanside**

- Prepared implemented, and analyzed telephonic survey of 803 residents of Northern San Diego County concerning awareness, behavior, and opinions about water runoff pollution.

**San Diego County**

- Prepared, implemented, and analyzed 1,305 person telephonic survey of unincorporated area residents concerning awareness, behavior, and opinions about water runoff pollution.

- Conducted, analyzed and reported upon two 600-person telephonic public opinion and awareness surveys before and after public awareness campaign to inform county residents about emergency preparedness.

- Prepared, implemented, and analyzed 8 intercept surveys of law library users concerning classes offered, benefits, opportunities for improvement.

- Evaluated the San Diego Community Planning Process as viewed by planning group participants and informed parties (developed questionnaire, analyzed data, and prepared a final report).

**City of Coronado**

- Prepared, implemented, and analyzed 600 respondent in-person intercept survey of visitors to identify places of staying, recreational activities, modes of transportation.

**City of Carlsbad**

- Prepared, implemented, and analyzed citywide sample telephone survey of 600 respondents concerning future urban commercial development in this fast growing Northern San Diego County city.  Extensive analysis of underlying values through various development scenarios and conjoint analytical techniques was featured.

**City of San Diego**

- Prepared, implemented, and analyzed 400 person telephone survey of residents of three low income San Diego communities concerning issues such as crime,

**Exhibit TT
949**

economic development, city services, and the success of the City's "Weed and Seed Program."

- Prepared, administered, and analyzed sample survey of San Diego County residents for purposes of assessing utilization and demand factors for Mission Bay Park in San Diego. This survey of 850 persons served to inform the revision of the Park's Master Plan.

- Analysis of market for existing condominium developments in downtown San Diego. Detailed analysis included extensive survey and corresponding statistical and qualitative analysis including recommendations for future market composition.

- Consultant for the revitalization of an older commercial retail area in mid-city San Diego seeking to rejuvenate its retail base. Three surveys and a series of key participant discussions were performed in conjunction with this effort--existing retailers, potential retailers, and residents of the area--plus corresponding statistical and qualitative analysis. Final report included a recommended retail structure for the community that would be realistic, implementable, and sensitive to the diversity of ethnicity in this community.

- Prepared, conducted, and analyzed 600 person telephone survey in mid-city for purposes of establishing need for community court in the area populated by myriad low-income minority and immigrant groups. Also in-person interviews/surveys of 100 local business owners.

- Prepared, implemented and analyzed 400 person survey of City residents concerning water supply awareness, conservation attitudes and behaviors, and opinions about water recycling.

- Prepared, administered, and analyzed sample survey of San Diego County residents for purposes of assessing utilization and demand factors for Mission Bay Park in San Diego, including fee analysis.

### County of Orange

- Prepared, implemented, and analyzed 1,040 person telephone survey of unincorporated area (North Tustin) in order to assess level of service satisfaction issues and potential annexation/sphere of influence adjustments

### County of San Diego

- Prepared, implemented and analyzed two 600 person surveys of County residents concerning emergency preparedness before and after public information campaign

### Otay Water District

- 2009 Customer Awareness and Satisfaction Survey of 300 customers of the District

**Exhibit TT**
**950**

- 2009 Large Users Drought Telephone Survey

- 2008 Customer Service telephone survey of 300 participants prepared, conducted, and analyzed.

- 2008 Customer Awareness and Satisfaction telephone survey of 300 participants prepared, conducted, and analyzed

- 2008 Employee Satisfaction survey prepared conducted and analyzed using web-based instrument.

- 2007 residential customer satisfaction/awareness (n=300) telephone survey prepared, implemented and analyzed. Emphasis upon customer satisfaction and conservation measures.

- 2007 Call Center customer service telephone survey (n = 200) focused upon satisfaction with customer service and communications.

- 2005 customer satisfaction survey of 350 residential customers concerning behavior, opinion, customer service, desalination, water reclamation, and conservation practices.

**Imperial Irrigation District**

- Instruction to energy traders in use of mathematical and statistical tools to aid in their requisite analyses.

- Developed statistical models that predict energy consumption based upon various climactic conditions to within 1-3% of actual.

**San Luis Rey Indian Water Authority**

- Prepared and supervised administration of detailed census and opinion survey of 2,500 members of five Indian tribes. Particular emphasis was given to issues of importance to the tribes' members such as job opportunities, education, cultural issues, economic development opportunities and transportation access issues. Focus group sessions with each tribe were utilized to complement the survey findings. Final report included both census data and fully tabulated and statistically analyzed summary of the opinions of reservation residents.

**City of Poway, California**

- Prepared, administered, and statistically analyzed a mail survey of 800 Poway businesses regarding their needs and opinions concerning Poway's business climate and future opportunities. Final report included detailed analysis and exposition, including recommendations where appropriate.

- Prepared, administered, and statistically analyzed a mail survey of 6,000 Poway households concerning their opinions regarding a variety of issues of importance to the City for future planning. Final report included fully tabulated results with accompanying statistical reports

**Exhibit TT
951**

**North Park Main Street Association**

- Conducted two intercept surveys--business owners and shoppers in San Diego Main Street National Historic Preservation Area in order to determine shopping needs and level of improvement or decline in area since the implementation of the Main Street program.

**City of Dana Point, California**

- Prepared recreation and parks needs assessment survey for administration to general public.

**City of Davis**

- Prepared, administered, and analyzed sample survey of 833 residents of Davis, California for purposes of assessing utilization, demand, and tax allocation factors for City of Davis Department of Parks and Recreation in concert with the preparation of the Master Plan.

**City of St. Helena**

- Prepared, administered, and analyzed 400 respondent sample survey of City of St. Helena, California residents for purposes of General Plan revisions.

**California Center for Sustainable Energy**

- Focus groups regarding new State of California program designed to encourage conversion of water heating systems to solar.

**Santa Clarita Transit**

- Three focus groups among Latinos, commuters, and local bus riders to identify service and marketing-related issues and policies for rider attraction and retention.

**Southern California Regional Rail Authority (Metrolink)**

- Determined the requisite two-stage sample for Federal Transportation Agency requirements for annual passenger and mileage calculations.

- Conducted a 3,500 person rider/on-board sample survey on 7 Metrolink lines regarding customer satisfaction, importance, problem occurrences, travel behavior, marketing strategies, and demographics. Also undertaken were precise counts of passenger boardings and alightings at each station for each train in the Metrolink train system.

- Conducted a 6,000 person rider/on-board sample survey on 6 Metrolink lines regarding customer satisfaction, importance, problem occurrences, travel behavior, marketing strategies, and demographics.

**Exhibit TT**
**952**

- Conducted focus groups with student riders and potential riders of Metrolink.

- Conducted Riverside County rider focus groups for Metrolink regarding use of new stop and need for reverse commute trains.

## California Department of Transportation

- Prepared growth inducement study for State Route 56 through the northern portion of the City of San Diego. Study included fiscal impacts as well as housing, employment, and income forecasts; also included were planning implications of possible growth inducing factors associated with the construction of the highway.

- Conducted focus groups and web-based survey of CALTRANS engineers regarding job satisfaction and staff morale.

- Eight surveys among pilot study riders of combined commuter train/rental car system of commuting.

## San Diego County Sheriff's Department

- Established analysis by station (11) of workload and availability for calls for service among Sheriffs patrol deputies. Over 3,000 samples drawn and analyzed to establish manpower needs.

- Utilized scientific sample to analyzed time savings applicable to the conversion of arrest data to laptop computers from manual entry. Final report included specific determination of manpower hours saved and recommendations for software and operational policy changes in order to maximize technological advantages.

- Workload analysis based upon sample of time logs from Sheriffs Communication Center and Monte Carlo simulations in order to identify necessary staffing levels for 9-1-1, radio, and administrative communications throughout San Diego County

## North Park Main Street Association

- Conducted study of business owners and shoppers in San Diego Main Street National Historic Preservation Area in order to determine shopping needs and level of improvement or decline in area since the implementation of the Main Street program.

## Bay Area Rapid Transit

- Market analysis and ridership projection for two stations located on East Bay line of BART.

**Exhibit TT
953**

**Southern California Association of Governments**

- 800 person survey and 6 focus groups to determine desired route for high-speed rail from Northern California between Los Angeles and San Diego.

- 5200 person survey of pedestrian, passenger vehicle, and commercial truck border crossers at Calexico and Algodones/Yuma pertaining to trip purpose, frequency, origin/destination, and other factors.

**Riverside Transit Agency**

- On-board survey of 8000 riders of Riverside bus system regarding satisfaction, frequency, demographics

**San Diego Metropolitan Transit System**

- On-board counts of weekend contract service

- Conducted focus groups concerning routing/scheduling and planning/marketing issues for the expansion of the San Diego Trolley.

**Imperial Valley Transit**

- Year long sample survey and count of passengers on-board buses in order to meet Federal Transportation Agency requirements for statistically reliable estimate of annual passenger miles traveled.

**University of California PATH/SANDAG**

- Six Month panel for focus groups and surveys at start and end concerning new transit plan that utilizes rental cars at either end of transit trip.

**San Diego Association of Governments**

- Focus groups concerning carpool, vanpool, transit alternative commute options.

**University of California, Davis**

- Web-based survey of all identifiable San Francisco Bay Area water management professionals concerning water conservation policies and practices, including follow-up telephone interviews.

**City of Escondido**

- Prepared, administered, and statistically analyzed telephone survey of 425 residents concerning library facilities.

**California Center for Sustainable Energy**

- Focus groups concerning the use of solar energy for residential power users – both contractors and residents participated.

**Exhibit TT
954**

- Focus groups among homeowners with photovoltaic systems, real estate professionals, and city/county permitting and inspection officials concerning barriers to and solutions pertaining to photovoltaic system installation and ownership.

### *In the fields of economic, financial, and fiscal impact analyses:*

#### State of California (Senate Rules Committee, Senate Select Committee on Border Issues, and Office of the Auditor General)

- Analysis of fiscal impact of undocumented immigrants on public services in San Diego County, including criminal justice system, education, and public health. Further identified estimated number of undocumented residents and their contributions to State and local tax revenues. Included in the analysis were federal revenues, false documentation issues, and macro economic impacts. Study included substantial primary data gathering techniques, including direct interviews with undocumented immigrant workers and INS returnees for purposes of determining employment characteristics, revenue generation, demographics, and migration patterns.

#### California Department of Transportation

- Prepared growth inducement study for State Route 56 through the northern portion of the City of San Diego. Study included fiscal impacts as well as housing, employment, and income forecasts; also included were planning implications of possible growth inducing factors associated with the construction of the highway.

#### San Diego County Taxpayers' Association

- Prepared economic and financial analysis of San Diego County Multiple Species Conservation Program for presentation to Planning Commission, City Council, and Board of Supervisors, including imposition of fee required to assemble the land.

- Prepared analysis of economic effects of proposed San Diego development impact fee program. Study included both academic, theoretical analysis and practical fiscal impact considerations.

- Written analysis and critique of Planned Growth and Taxpayer Relief Initiative – Development Impact Fee proposal for consideration before San Diego City Council.

- Fiscal Impact Analysis of Olivenhein Dam project of San Diego County Water Authority.

- Prepared general fiscal impact analysis of mobile home rent control ordinances in State of California.

**Exhibit TT
955**

**Westfield Shopping Centers**

- Analysis of proposed City of San Diego Affordable Housing Impact Fee, including recalculation and allocation among land uses

- Analysis of potential sales and fiscal impact due to expansion of University Town Center, La Jolla, CA

**San Diego Aircraft Carrier Museum Foundation**

- Prepared fiscal impact analysis regarding the establishment of the USS Midway aircraft carrier museum on San Diego Bay.

**Pardee Construction Company**

- Prepared Economic Impact Analysis of proposed all-cargo airport at Brown Field, including job creation and related industrial/commercial/visitor development

- Prepared Economic/Fiscal Impact Analysis of 2,650 acre "high-end" Pacific Highlands Ranch residential development in Carmel Valley area of San Diego. Included determination of impact fees.

**Westbrook Development**

- Economic/Fiscal Impact Analysis of 2,550 acre residential/ commercial/resort development at Fanita Ranch in Santee. Included determination of impact fees for the development and alternative use as open space.

**Genstar Development**

- Economic/Fiscal Impact Analysis of 3,000 acre 4S Ranch residential/commercial development in San Diego County. Included determination of development impact fees.

**San Diego Gas & Electric**

- Analysis of feasibility and fiscal impact of City of San Marcos proposal to form and operationalize its own municipal utility—Discovery Valley Utility

- Environmental/Fiscal analysis of San Diego Gas & Electric's 2004 Energy Resource Plan.

- Economic analysis of "Sunrise Power Link" to Imperial County

- Analysis of fiscal impact of Carlsbad agricultural protection measures proposed on 2006 ballot

**Exhibit TT
956**

**Southwest Strategies, LLC**

- Fiscal Impact analysis for potential rezoning of industrial land to residential in Oceanside, California—determined and compared impact fees for industrial and residential use, including transportation impact fees.

- Analysis of proposed City of San Diego Affordable Housing Impact Fee, including recalculation and allocation among land uses.

- Socio-economic profile of residents of 5 affordable housing developments in the City of Poway, including demographics, spending, impacts on crime, schools, property values

- Examination of financial implications of rezoning Old Town National City to remove non-conforming industrial uses

**Shea Properties**

- Fiscal impact of proposed redevelopment of Barrio Logan with Mercado and affordable housing in San Diego.

**Laing Urban**

- Fiscal Impact analysis for potential rezoning of industrial land to residential in Culver City, California-- determined and compared impact fees for industrial and residential use, including transportation impact fees

**San Diego-Imperial Counties Labor Council AFL-CIO**

- Analysis of San Diego County Water Authority-Imperial Irrigation District water transfer in terms of environmental and economic obstacles faced and economic development opportunities to be derived from funds to be available within the Imperial Valley.

**WESTEC Services, Inc.**

- Prepared socioeconomic present condition, impact, and mitigation sections of Environmental Impact Report for California State Prison and San Diego County jail and honor camp at Otay Mesa.  Also prepared project description and statement of needs chapter, crime rate and socioeconomic hazards sections.

**Mooney & Associates**

- Prepared socioeconomic present condition, impact, and mitigation sections of economic impact report for expansion of San Diego County jail in Santee.  Also prepared project description and statement of needs chapter, crime rate and socioeconomic hazards sections.

**Exhibit TT
957**

**Joint Labor Management Committee of the Retail Food Industry**

- Analysis of impacts of large "big box" retailers upon existing merchants. Particular emphasis upon downtown impacts and planning consequences in light of movement toward smart growth. San Diego's City of Villages strategy was assessed in this regard.

- Economic Impact of supercenter retail development upon California jobs, health and welfare expenditures, and general economic conditions.

**City of San Diego**

- Determined shopping needs and level of improvement or decline in North Park community since the implementation of the Main Street Historic Preservation Program.

- Analysis of market for existing condominium developments in downtown San Diego. Detailed analysis included extensive survey and corresponding statistical and qualitative analysis including recommendations for future market composition.

- Consultant for the revitalization of an older commercial retail area in mid-city San Diego seeking to rejuvenate its retail base. Final report included a recommended retail structure for the community that would be realistic, implementable, and sensitive to the diversity of ethnicity in this community.

**La Jolla Band of Mission Indians**

- Marketing and management consultants for Sengme Oaks Water Park, a water theme amusement park in Northern San Diego County. Prepared formal marketing and management plans for the Park.

**Merrill Lynch Commercial Real Estate**

- Provided a variety of on-going property valuation and real estate consultative services including improved and unimproved real property appraisals and land use feasibility planning for large acreage.

**City of Carlsbad**

- Analyzed future urban commercial development in fast growing Northern San Diego County city.

**Chelsea Investments, Inc.**

- Analysis of job creation for three development proposals: Children's Village in San Diego, child care facilities and four-story offices in San Diego, and residential/commercial development in San Luis Rio Colorado, AZ.

**Exhibit TT
958**

**Stirling Enterprises**

- Fiscal Impact analysis of proposal to rezone parcel of industrial land into multiple residential in Oceanside, California--determined and compared impact fees for industrial and residential use, including transportation impact fees

- Projected Jobs-Housing equilibrium point for City of Oceanside

**Viejas Enterprises**

- Socio-economic analysis of proposal to locate Indian casino in City of Calexico, California

- Socio-economic/fiscal impact analysis of tribal casino in Alpine, California

**Foxwoods/Pauma Development**

- Multiplier, Housing Needs, Employment, Crime, Pathological Gambling analyses for casino development in northern San Diego County

**County of Orange**

- Prepared, implemented, and analyzed study of unincorporated area (North Tustin) in order to assess level of service satisfaction issues and potential annexation/sphere of influence and fee adjustments.

**Housing Solutions**

- Socio-economic profile of residents of 5 affordable housing developments in the City of Poway, including demographics, spending, impacts on crime, schools, property values

**National City Smart Growth Coalition**

- Planning and economic consultant to business owners in National City Westside regarding new land use plan for community.

**City of Davis**

- Prepared, administered, and analyzed study of Davis, California for purposes of assessing utilization, demand, and tax allocation factors for City of Davis Department of Parks and Recreation in concert with the preparation of the Master Plan.

**Exhibit TT**
**959**

**Subway, Inc. and Pacific Century Development**

- Analysis of two sites in Blythe, CA to determine market absorption potential for new hotel/motel developments.

**City of Holtville**

- Economic consultant to City in process of dissolving Joint Powers Authority in order to secure fair share of proceeds.

**San Diego Housing Commission**

- In accordance with the City of San Diego SRO Preservation Ordinance, an inventory of all existing guest rooms in the City of San Diego was performed in order to retroactively identify rooms that qualified as single room occupancy hotel rooms as of December 1985, December 1987 and May 1988. The purpose of this survey was to identify a baseline number of such units for presentation purposes. Prepared SRO identification methodologies, computerization formats, statistical analyses, and final report with room-by-room breakdown.

**Rodney Company and Save Our Rural Environment**

- Fiscal impact and economic analysis of proposed Multiple Species Conservation Program—North County.

- Fiscal impact and economic analysis of proposed General Plan Update for San Diego County

- Analysis of impact of San Diego County General Plan upon transportation, education, and public safety services in rural San Diego County.

**Exhibit TT**
**960**